**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| MURRAY C. TURKA, on Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>SOUTH CAROLINA PUBLIC SERVICE AUTHORITY and LONNIE N. CARTER,<br><br>Defendants, | CIVIL ACTION NO.: 2:19-cv-1102-RMG<br><br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** |

Plaintiff Murray C. Turka ("Plaintiff"), individually and on behalf of a class of similarly situated persons and entities, by their undersigned attorneys, allege the following against the South Carolina Public Service Authority ("Santee Cooper"), and Lonnie N. Carter ("Carter") upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.

Plaintiff's allegations concerning matters other than himself and his own acts are based upon the investigation conducted by and through counsel, which included, among other things, the review and analysis of: (i) transcripts, press releases, news articles, and other public statements issued by or concerning Santee Cooper; (ii) Santee Cooper's website; (iii) transcripts of hearings before regulators and select committees of the South Carolina Senate and House of Representatives; (iv) documents produced to Plaintiff's counsel through the Freedom of Information Act ("FOIA") requests; (v) press reports; and (vi) other publicly available information. Plaintiff believes that substantial additional

1

evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.       This is a federal securities class action brought on behalf of purchasers of South Carolina Public Service Authority mini-bonds ("Mini-Bonds") between May 1, 2014 and July 31, 2017 for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule l0b-5 promulgated thereunder. The Mini-Bonds were sold and marketed exclusively to residents of South Carolina, customers of the South Carolina Public Service Authority, and electric customers of the Bamberg Board of Public Works, South Carolina and the City of Georgetown, South Carolina.

2.       South Carolina Public Service Authority, a state-owned utility that is also known as Santee Cooper, produces, distributes, and sells electric power within the counties of Berkeley, Calhoun, Charleston, Clarendon, Colleton, Dorchester, Orangeburg, and Sumter, South Carolina.

3.       In May 2008, SCANA Corporation ("SCANA") and Santee Cooper reached agreement as joint owners to build two new 1,117-megawatt AP1000 nuclear reactors at the V.C. Summer site (the "Nuclear Project").  The ownership interest was split with SCANA taking a 55% ownership stake and Santee Cooper the remaining 45% share. These two nuclear reactors would be the first new nuclear power plants to be built in the Unites States since the 1980s.

4.       If the Nuclear Project were completed by January 1, 2021, SCANA and Santee Cooper would qualify under the Energy Policy Act for nuclear tax credits worth approximately $2.2 billion.

5.      Yet, the January 2021 goal for the completion of the project was always a pipedream.  As detailed herein, and despite statements to the contrary, by at least 2015 the Nuclear Project was hopelessly behind schedule.  Still, executives at Santee Cooper disclosed nothing of this to Mini-Bond investors.

6.      Though the thought did cross their mind.  In the fall of 2015, Santee Cooper executives (including Carter) met with their attorneys regarding Bechtel Corporation's ("Bechtel"), an engineering, construction and project management firm, assessment of the status of the Nuclear Project.  There, an unidentified individual asked a pivotal question – should the status of the Nuclear Project be disclosed to Mini-Bond holders? The question is memorialized in handwritten notes from the meeting:



7.      Santee Cooper elected not to disclose material information.

8.      On July 31, 2017, SCANA and Santee Cooper announced that they would abandon construction of the Nuclear Project, citing rising construction costs.  It quickly became clear that this was no innocent business failure; rather, it was radical and indefensible mismanagement.

9.      A year later, Moody's would downgrade Santee Cooper's credit rating noting a "negative" ratings outlook.  Moody's August 17, 2018 press release stated in pertinent part:

> New York, August 17, 2018 – Moody's Investors Service has downgraded the rating on the South Carolina Public Service Authority (Santee Cooper) revenue bonds to A2 from A1, along with Santee Cooper bank bond rating to A3 from A2. Concurrent with this rating action, Moody's confirmed Santee

3

Cooper's non-letter of credit backed commercial paper program rating at Prime-1.

The rating outlook is negative. Today's rating action concludes the rating review on Santee Cooper that was initiated on May 1, 2018.

RATINGS RATIONALE

…The downgrade also reflects the very high leverage that will persist for many years owing to the termination of the Summer Nuclear project which has introduced cost recovery challenges to Santee Cooper, particularly in the near-to-medium term.

10.     As discussed further herein, Defendants knew the Nuclear Project was in jeopardy for years prior to announcing its abandonment.  Defendants knew that the Nuclear Project's failure would sacrifice critical tax credits Santee Cooper would need to fulfill its debt obligations.  And Defendants knew that the information they kept quiet was material to purchasers of Santee Cooper Mini-Bonds was material.  Despite this knowledge, Defendants chose to actively conceal this information from Mini-Bond holders.

## JURISDICTION AND VENUE

11.     This Complaint asserts claims under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

12.     This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331 and 1337.

13.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), (c), and (d). Many of the acts and omissions that constitute the alleged violations of law, including the dissemination to the public of untrue statements of material facts, occurred in this District.

4

14.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of national securities exchanges.

## PARTIES

15.     Plaintiff purchased Santee Cooper Mini-Bonds in accordance with the attached Certification.

16.     Defendant Santee Cooper is a state-owned utility that produces, distributes, and sells electric power within the counties of Berkeley, Calhoun, Charleston, Clarendon, Colleton, Dorchester, Orangeburg, and Sumter, South Carolina.

17.     Defendant Carter served as President and Chief Executive Officer of Santee Cooper during the Class Period.

## SUBSTANTIVE ALLEGATIONS

18.     In December 2005, Santee Cooper and SCANA's primary subsidiary, South Carolina Electric & Gas ("SCE&G") notified the U.S. Nuclear Regulatory Commission ("NRC")—the federal agency that regulates nuclear energy in the U.S. and oversees reactor licensing, safety, security, and radioactive material—that they intended to apply for a combined license for building two new reactors in South Carolina.  On February 10, 2006, SCE&G and Santee Cooper selected the V.C. Summer Site for potential new nuclear construction and announced plans to build nuclear reactors using a new advanced light water reactor, the "AP1000," designed by Westinghouse Electric Company LLC ("Westinghouse" or "WEC"), which offers nuclear products and services to utilities, including the design of nuclear power plants.  The companies' goal was to build the

reactors in time to meet the growth in "base load" electricity demand anticipated by the mid-2010s. "Base load" on an electric grid is the minimum level of demand over a period of time.

19.    In May 2008, SCE&G and Santee Cooper (together, the "Owners") entered into an agreement as joint owners (the "Owners") to build two new 1,117-megawatt AP1000 nuclear reactors at the V.C. Summer Site (the "Nuclear Project"). SCE&G took a 55% stake in the Nuclear Project while Santee Cooper took the remaining 45% stake. These nuclear reactors would be among the first new nuclear plants to be built in the U.S. since the 1980s.

20.    In May 2008, SCE&G and Santee Cooper—as 55% and 45% owners of the project, respectively—entered into an Engineering, Procurement, and Construction contract (the "EPC Contract") with Westinghouse, an American nuclear power company that was the chief contractor for the Nuclear Project, and Stone & Webster to build two Westinghouse AP1000 Nuclear reactors at the V.C. Summer Site. On May 30, 2008, SCANA submitted to the South Carolina Public Service Commission ("PSC") a "Combined Application for Certificate of Environmental Compatibility, Public Convenience and Necessity and For a Base Load Review Order to the PSC" (the "Combined Application"). The Combined Application submitted under the Base Load Review Action ("BLRA") documented the need for new electric generation in South Carolina and purportedly provided information necessary to allow state regulators to determine the prudency of the Company's plans to construct the two new nuclear units to meet that need. The Combined Application was signed by Kevin Marsh ("Marsh"), who was then the President of SCE&G and who would later become SCANA's CEO.

21.    As part of its analysis of the Combined Application, the PSC began holding public hearings to consider the request.  During a September 16, 2008 hearing before the PSC, executives for SCANA detailed the close oversight that SCANA and Santee Cooper would exercise over the Nuclear Project's construction.  For example, Marsh testified that:

> As Mr. Byrne will testify, SCE&G is assembling a team of engineering and construction personnel, with accounting and administrative support, to monitor all aspects of the construction process and to ensure that the EPC contract is administered as intended . . .  In all, we estimate more than 50 people will be assigned to this task. At the center of this structure will be a dedicated group of SCE&G personnel that will monitor each aspect of the construction process on a day-to-day basis and will report progress, issues and variances *to an executive steering committee that includes me as SCE&G's president, and a senior executive from Santee Cooper and to the SCANA board of directors*. *This project will be monitored on a sustained and continuous basis by all levels of the reporting chain* . . .

22.    Specifically, throughout 2013 and 2014, Carter and Marsh secretly complained to each other, and to Westinghouse, that the Nuclear Project was "in danger" because of submodule shipment delays and design failures.  For example, an August 23, 2013 letter from Carter to Marsh detailed Westinghouse and CB&I's "submodule delivery issues," which "has been *a major source of concern and risk for this project for a long time*" and which "plac[ed] the project schedule in jeopardy once again."  In particular, Carter wrote that CB&I and Westinghouse "do not function well as a team to resolve critical project issues" and that, in Santee Cooper's view, "the Consortium's inability to fulfill their contractual commitments in a timely manner *places the project's future in danger*."  Carter noted that, "based on [their prior] discussion," Marsh "shares [Carter's] concern" about this "critical issue for the project and our companies," and asked Marsh to help "develop a plan forward" and "insist that the Consortium provid[e] a realistic plan

. . . to fabricate and deliver the submodules in a timely manner to complete the project on schedule."

23.    In response, Marsh requested a meeting with Westinghouse and CB&I. In a September 5, 2013 email to the Westinghouse and CB&I Nuclear Project heads, that was also sent to Carter and other SCANA executives, Marsh stated that they needed to meet "to discuss the status of our nuclear project" because SCANA and Santee Cooper "continue to have serious concerns about the consortium's ability to deliver modules from the Lake Charles facility" after three years "of unsuccessful attempts to resolve its manufacturing problem."  Marsh emphasized that "missed deadlines put potentially **unrecoverable stress on the milestone schedule** approved by the SC Public Service Commission,' which, at that time, called for Nuclear Project completion by May 2018.

24.    The 2013 communications and meetings did little, if anything, to fix the serious problems causing "unrecoverable stress" on the schedule.  Not only did the delays and missed deadlines continue unabated, but the submodules that were delivered to the Nuclear Project site suffered from numerous design and construction flaws.  A May 6, 2014 letter from both Marsh and Carter to the leaders of Westinghouse and CB&I detailed the history of the contractors' "**poor performance**" on delivery and design, "and their combined effect on the expected completion date and cost of the project." In particular, the letter described how the submodules that had been delivered were flawed and "required documentation processing and repairs" that were still not corrected by May 2014.  Marsh and Carter identified numerous failures, each of which "tested our resolve," and informed the Consortium that "**[a]s a result of these events, our frustration continues to mount**" because "**[y]ou have made promise after promise, but fulfilled**

8

*few of them*."  They also noted that these "***unexcused delays will cause our project costs to increase greatly.***"

25.    Unknown to the PSC at the time of its September 10, 2015 order, however, the early 2015 statements that the primary cause for delay at the Nuclear Project was the Consortium's "delay in the production of submodules for the Units" and that "many of the initial risks and challenges of new nuclear construction have been overcome" were not accurate.  According to an internal Santee Cooper document, dated November 28, 2016, that recounted the history of the Bechtel relationship (the "SC Nuclear Timeline"), Santee Cooper began pressing SCANA executives "to engage outside assistance with management" of the Nuclear Project by the end of 2014 due to the need for "[i]ncreased project management expertise in large scale EPC construction" at the Nuclear Project.

26.    On February 10, 2015, Bechtel, one of the world's most respected engineering, construction, and project management companies, submitted an "Assessment Proposal" to SCANA and Santee Cooper.  According to the proposal, Bechtel would provide an "assessment [] to assist the owners of the V.C. Summer Nuclear Generating Stations Units 2 & 3 in better understanding the current status and potential challenges of the project as a first step in helping to ensure the project is on the most cost-effective trajectory to completion."  Bechtel made clear in its Assessment Proposal that its work would not be used in the context of current or anticipated litigation: "this team will not evaluate the ownership of past impacts or validity of pending or future claims."  No immediate action was taken on Bechtel's proposal.

27.    By April 2015, internal communications between SCANA and Santee Cooper revealed that a completion date in 2020 was unlikely, and that the project was

significantly over budget.  On April 6, 2015, Santee Cooper's Senior Vice President for Nuclear Energy, Michael Crosby ("Crosby"), emailed SCANA executives a series of charts "that were discussed in the Executive Steering Committee meeting" with SCANA. In this email, Crosby noted that for one chart depicting the "total target cost impact of the Consortium's poor management of productivity and labor ratios," "*a total cost curve" using an "average of the actual numbers recorded on the project*" over the last five months "is not shown on the graph because *it would be off the chart*."  He further discussed that even in the positive scenarios represented in this chart "*still result in cumulative target costs that are significantly over budget*."  Thus, Santee Cooper knew as early as April 2015 that the total costs for the Nuclear Project would substantially exceed the public cost estimates, even if they were able to improve construction productivity.

28.    The April 6, 2015 email also attached another chart titled "Percent Complete – Direct Craft Work," which depicted the Nuclear Project's progress based on skilled labor hours:



29.    This chart showed the dramatic disparity between the Nuclear Project's "***actual*** progress to date" versus the progress "***required*** to achieve [the] Jun[e] 2019/Jun[e] 2020 SCDs [substantial completion dates" for Units 2 and 3 (represented by the green dotted line).  Specifically, the chart revealed that construction of the Nuclear Project was roughly 16% complete by January 2015 and had progressed only 8% in the prior 24 months – a rate of ***0.33% progress completed per month***.  According to the chart, Unit 2 would not even reach ***35%*** completion by its July 2019 purported completion date if progress continued at the same pace.  This chart demonstrated clearly that in order to complete the remaining 86% of construction over the remaining 42 months left in the

11

schedule for Unit 2, the rate of construction progress would have to increase to at least 2% per month – six times the current rate – and it would have to improve immediately.

30.    According to the SC Nuclear Timeline, SCANA and Santee Cooper executives met with the nuclear team from Bechtel the next day – April 7, 2015 – to discuss their Assessment Proposal and decided to proceed with the engagement.

31.    On May 1, 2014, Santee Cooper published a disclosure statement (the "2014 Disclosure Statement") announcing the issuance of $39,584,800 worth of Mini-Bonds.  The 2014 Disclosure Statement contained the following "risk" factor:

> Nuclear Construction - Risk Factors. The construction of large generating plants such as Summer Nuclear Units 2 and 3 involves significant financial risk. Delays or cost overruns may be incurred as a result of risks such as (a) inconsistent quality of equipment, materials and labor, (b) work stoppages, (c) regulatory matters, (d) unforeseen engineering problems, (e) unanticipated increases in the cost of materials and labor, (f) performance by engineering, procurement, or construction contractors, and (g) increases in the cost of debt. Moreover, no nuclear plants have been constructed in the United States using advanced designs such as the Westinghouse AP1000 reactor. Therefore, estimating the cost of construction of any new nuclear plant is inherently uncertain.

> To mitigate risk, SCE&G, acting for itself and as agent for the Authority, provides project oversight for Summer Nuclear Units 2 and 3 through its New Nuclear Deployment ("NND") business unit. The Authority provides dedicated on-site personnel to monitor and assist NND with the daily oversight of the project. The managerial framework of the NND group is comprised of in-house nuclear industry veterans who lead various internal departments with expertise in: nuclear operations, engineering, construction, maintenance, quality assurance and nuclear regulations.

32.    By this time, it was already clear that no effective oversight was in place.

33.    On May 11, 2015 and May 27, 2015, SCANA executive Stephen A. Byrne ("Byrne") exchanged emails with Crosby, copies of which were provided to Plaintiff through FOIA requests.  Crosby wrote that Santee Cooper was eager to retain Bechtel, and noted that "Lonnie [Carter] is extremely (motivated) and ready to move forward on

this . . . and would like to see us get documents to Bechtel as soon as possible so that Bechtel can begin . . . ."  Crosby also suggested to Byrne that "[m]aybe with the blessing of our legal teams . . . *we could (NDA) wrap Bechtel into an Owner's engineer role ?? [sic] that would allow Bechtel to start reviewing documents*. Please stew on this a bit . . . and let's get back together soon on what we can do to get the program jump started . . . I'm feeling some real heat on this one."

34.     About two weeks later, on May 27, 2015, Byrne sent Crosby and others at Santee Cooper an email with the subject line "Bechtel NDA."  Byrne relayed that he "had a conversation with Kevin Marsh this afternoon relative to the NDA for Bechtel *to do the third party assessment or act as Owner's Engineer* and he had no problem with Bechtel reviewing what you have now."  He did not want to engage Bechtel yet, because he wanted to "*discuss with the consortium CEOs first*."

35.     These May 2015 emails between Santee Cooper and SCANA show that both companies envisioned Bechtel's role as providing a "third party assessment or act[ing] as Owner's Engineer,"—*i.e.* a qualified engineering expert to assess the project. They agreed to Bechtel signing an NDA, a non-disclosure agreement, so that Bechtel could more quickly gain access to confidential documents related to the Nuclear Project for purposes of beginning the assessment urged by Santee Cooper.

36.     Internal Santee Cooper documents produced in response to FOIA requests reveal that on June 1, 2015, Bechtel executed a Proprietary Data Agreement – and NDA – with SCE&G that allowed Bechtel access to confidential "information in oral, written or physical form" related to the "AP1000 Nuclear Power Plant(s) and related facilities."

37.     A June 1, 2015 email between executives from Santee Cooper, Bechtel and SCANA, produced in response to FOIA requests, reveals that, for the first time, "the possibility that Bechtel might be retained by" outside counsel was discussed.  A Bechtel executive responded that "we are flexible and we are willing to be retained by your outside counsel if you believe that would be preferable."

38.     While Bechtel was amenable to being formally retained by SCANA's outside counsel, Bechtel clearly conveyed that its work was not privileged as it was shared with – and even conducted on behalf of – the Consortium. On June 1, 2015, Bechtel executed the Proprietary Data Agreement, to which Westinghouse was a beneficiary with rights of enforcement. Moreover, as evidenced in a string of emails between counsel for Westinghouse, SCANA and Santee Cooper on July 28, 2015 and July 30, 2015, which were produced in response to FOIA requests, Westinghouse and CB&I were active participants in providing edits to and then approving the language of the agreement retaining Bechtel and setting out the terms of Bechtel's assessment (the "Bechtel Agreement").

39.     Critically, in the fall of 2015, Carter and other Santee Cooper executives met with their attorneys regarding the hiring of Bechtel. There, an identified individual asked a pivotal question – should the status of the Nuclear Project be disclosed to Mini-Bond holders?  The question is memorialized in handwritten notes from the meeting:



40.     Specifically, SCANA and Santee Cooper commissioned Bechtel to write a report that would contain an "evaluation of the current status and forecasted completion plan through the design, supply chain, and construction aspects" of the Nuclear Project. Composed of 14 members, the senior members of the Bechtel "Assessment Team" were well-equipped to evaluate the Nuclear Project.   Together, they had over 500 years relevant experience, 300 of which was dedicated to Engineering, Procurement & Construction nuclear experience and oversight of more than 85 projects similar in kind to the V.C. Summer Nuclear Project.

41.     Bechtel's assessment was comprehensive.   Over the course of three months, the Bechtel team (i) reviewed over 350 Nuclear Project documents; (ii) attended 70 meetings with personnel from Westinghouse, CB&I, SCANA and Santee Cooper; (iii) conducted 25 interviews with personnel from Westinghouse, CB&I, SCANA and Santee Cooper; (iv) completed 24 site walkdowns and real time observations; and (v) attended 7 presentations on various subjects.

42.     Bechtel provided regular updates to Santee Cooper throughout its assessment. According to an internal Santee Cooper document, Craig Albert, the President of Bechtel Nuclear, Security & Environmental, personally held weekly update calls with Marsh and Carter between August 10 and October 16, 2015.  In addition, Santee Cooper was presented with Weekly Reports documenting the work completed by Bechtel each week, and the work planned for the next week. Marsh has since confirmed in 2017 testimony before the South Carolina House of Representatives that the information provided to him in Bechtel's weekly reports and phone calls included the negative information that "led to the ultimate conclusions [Bechtel] came to in the report."

43.    The Bechtel team determined there were "***significant issues***" facing the Nuclear Project that threatened its "successful completion."  On October 16, 2015, the Bechtel team met in person with Marsh to discuss the final results of their assessment. Six days later, Bechtel's presented its "project assessment, findings, and high-level recommendations" to SCANA's and Santee Cooper's executive management in SCANA's Cayce, South Carolina headquarters on October 22, 2015 (the "First Bechtel Report").

44.    Internal Santee Cooper documents confirm that the First Bechtel Report provided Santee Cooper with the key findings and recommendations regarding the Nuclear Project that were then documented in a November 9, 2015 report, discussed below. Specifically, on October 13, 2015, Bechtel emailed Crosby, Santee Cooper's Senior Vice President, its "Preliminary Assessment," which would "***form the basis of our presentation to the execs***" of SCANA and Santee Cooper, noting that Bechtel's recommendations "are still in development but ***will [also] be part of the exec review***." This email, received through FOIA requests, indicated that the "Scope of the Assessment" was focused on "evaluat[ing] the status of the project ***to assess the Consortium's ability to complete the project on the forecasted schedule.***"  Crosby forwarded this email to Carter on October 14, 2015, explaining that after the "CEO meeting" is "nailed down," likely for "the 22nd or 23rd" of October, Bechtel would "schedule a sit-down meeting with Byrne" and Crosby, "and also a separate meeting with [SCANA's] Jeff Archie's staff" before the First Bechtel Report meeting with the CEOs. Thus, although Crosby noted that "SCE&G has not seen this [Preliminary Assessment] yet," the email clearly indicated that it would be discussed even before the October 22, 2015 meeting.

45.     In his October 14, 2015 email forwarding the First Bechtel Report's preliminary assessment to Carter, Crosby noted that although he did "not see any real surprises ... *the Bechtel projection on commercial operation dates is sobering*." It was sobering because Bechtel's "preliminary assessment of the project schedule [was] that the *commercial operation dates will be extended*." Specifically, Bechtel stated in its email that Unit 2 would not be in operation until "*18-26 months beyond the current June 2019 commercial operation date*" and Unit 3 would not be completed until "*24-32 months beyond the current June 2020 commercial operation date*."

46.     In this email, Bechtel also identified other problems with the Nuclear Project's project management, controls, construction, engineering and licensing, and procurement that were later detailed in Bechtel's formal report. In particular, Bechtel found that "[t]he Consortium's forecasts for schedule durations, productivity, forecasted manhour peaks, and percent complete *are unrealistic*" and "*[t]he Owners do not have an appropriate project controls team to assess/validate Consortium reported progress and performance*."  Further, the Nuclear Project suffered from a "lack of accountability," and "[t]he current hands-off approach taken by the Owners towards management of the Consortium does not allow for real-time, appropriate cost and schedule mitigation."  With regard to engineering, Bechtel found that "*the issued design is often not constructible* (currently averaging over 600 changes per month)."

47.     Bechtel organized the Bechtel Report into five specific areas of assessment: (i) Project Management; (ii) Engineering and Licensing; (iii) Procurement; (iv) Construction and Project Controls, including an "Analysis of the Project Construction Schedule;" and (v) the Startup plans for the nuclear units once completed.  While the

cover of the First Bechtel Report notes that it is "Strictly Confidential," there is no mention of the First Bechtel Report being created in anticipation of litigation, being directed by attorneys, or otherwise being subject to attorney-client privilege.  Indeed, the Weekly Reports attached to the First Bechtel Report indicate that Bechtel's team spoke openly with employees of SCANA, Santee Cooper, Westinghouse, and CB&I without the attendance, participation, or input of any legal counsel.

48.    The First Bechtel Report also identified additional deficiencies related specifically to Santee Cooper and SCANA's management of the Nuclear Project, including, but not limited to, the following observations:

"As the Owners, SCE&G and Santee Cooper have the responsibility to manage their portion of the prime contract and ensure that the Consortium contractors are fulfilling their contractual observations." Yet, Bechtel observed that "[t]here is *a lack of accountability*" in various departments, and [t]he approach [to project management] taken by [SCANA and Santee Cooper] *does not allow for real-time, appropriate cost and schedule mitigation.*"

"The Owners' [SCANA and Santee Cooper] organization *lacks the appropriate personnel to provide the proper level of review and oversight required to drive the project to successful completion*."

"The Owners' oversight organization does *not have a proper Project Controls staff*."

"The Consortium *does not appear to be commercially motivated to meet Owner goals*."

"[T]he V.C. Summer Units 2 & 3 project suffers from various *fundamental EPC and major project management issues that must be resolved for project* success."

49.    An internal Santee Cooper document, made available in response to FOIA requests, details notes of a February 4, 2016 telephone call between a Santee Cooper employee and Ty Troutman ("Troutman"), a Bechtel Principal Vice President who is listed as an "Assessment Reviewer" in the First Bechtel Report.  These notes confirm that

SCANA, through its outside counsel, requested that "the schedule and other information be removed." The notes reveal that in mid-December, Troutman called Byrne to discuss the First Bechtel Report and the requested redactions. Troutman concluded from this call that Defendant Byrne had either read the First Bechtel Report or gotten a full download from outside counsel because "Byrne knew a lot about the content of the report." Byrne communicated to Troutman that "his feelings are hurt" and that "Bechtel was too rough on SCE&Gs 'EPC management skills.'" One month later, SCANA's outside counsel notified Bechtel that the "schedule piece must be removed and words negative on SCE&Gs 'EPC management skills' must be softened." According to these February 4, 2016 notes, Troutman agreed to separate Bechtel's conclusions about the schedule and completion dates "into a stand-alone report" and "submit 2 reports to George [Wenick, SCANA's outside counsel] . . . *knowing George will discard the schedule report*."

50.    A day after the call with Troutman, on or about February 5, 2016, Bechtel delivered a second Project Assessment Report (the "Second Bechtel Report") (together with the First Bechtel Report, the "Bechtel Reports"). The Second Bechtel Report was closely guarded and made available to only a handful of people. Each copy was numbered and the intended recipient identified on the cover. No new assessment work had been performed by Bechtel since the First Bechtel Report, and no additional information had been added to the document, but some of the most damaging conclusions concerning the schedule were stripped from the report. The cover of the Second Bechtel Report noted, as did the First Bechtel Report, that it was "Strictly Confidential," but again there was no mention of the Second Bechtel Report being created in anticipation of litigation or otherwise being subject to attorney-client privilege.

51.     Conspicuously missing from the Final Bechtel Report were the following key conclusions regarding the schedule for the Nuclear Project:

- "Based on Bechtel's assessment, **the current schedule is at risk**;"

- Bechtel's **new completion dates for Units 2 and 3 in 2021 and 2023**, respectively; and

- Bechtel's view that **the October 27, 2015 EPC Amendment would likely "caus[e] further delays" to the schedule.**

52.     In addition, twenty pages, including an entire section, titled "**Analysis of the Project Construction Schedule**" and supporting charts, all of which explained in detail Bechtel's methodology, bases, assumptions and results of its analysis of the revised completion schedule, were erased from the Second Bechtel Report.  In sum, the Second Bechtel Report entirely excluded Bechtel's fundamental conclusion that the Nuclear Project would not be completed in 2020 and, even in a good scenario, the Nuclear Project would not be completed until 2022, two years past the deadline promised to investors. According to the notes from the phone call between a Santee Cooper executive and Bechtel's Troutman, discussed above, Bechtel produced another report on February 5, 2016 with this missing information – a report that, according to the Santee Cooper notes of a February 4, 2015 call with Bechtel's Troutman, SCANA may have discarded.

53.     Despite these glaring removals made at SCANA's direction, the Second Bechtel Report still listed many of the same problems identified in the First Bechtel Report. These problems would have communicated to any observer that the Nuclear Project was failing and could not possibly be completed by the end of 2020.  As *The Post and Courier* later reported, the Second Bechtel Report made clear that "SCANA and Santee Cooper knew the effort to construct two nuclear reactors was failing more than a year before the ambitious energy project was scrapped [in July 2017]."

126.    Both the First and Second Bechtel Reports stated that the recently-revised schedule approved by the PSC in September 2015 "has slipped significantly" and "continues to slip," and identified "***[m]ajor Issues Affecting Schedule and Performance***," including:

- "A large percentage of the personnel on the project" have been "working too many hours for an extended period," which is proven to "reduc[e] productivity" and "negatively affect[] morale, decision making, and safety;"

- "Significant Non-Manual Turnover" of "greater than 17%, which is high for a typical nuclear plant" and is likely attributable to the Nuclear Project's "safety, cost, and schedule concerns" that were "compounded with the frustrations of design change" at the Units;

- A poor management process that minimized, rather than maximized, actual craftsmen time at the workface;

- "A large part of the schedule slip is related to late design changes, slow resolution of interference issues, and the time it takes to resolve construction errors and quality problems . . .  As long as there are late design changes occurring and there is not expeditious resolution of issues that arise, there will continue to be significant schedule slippages;" and

- The modular design strategies employed at the Units, "while a great concept, have proven to be an impediment to the construction and are more complicated to fabricate."

54.    The most important "***key schedule challenge***" identified by Bechtel in both the First and Second Bechtel Reports remained the Units' dismal progress percentages – a key indicator of whether the Nuclear Project could meet its schedule.  Without achieving the target level of 3% progress per month, Defendants had no hope of competing the Nuclear Project in the next five years.  Indeed, as Bechtel noted again, "***[i]n order for the plant to complete on schedule, monthly construction progress must increase to close to 3%.***"

55.     SCANA and Santee Cooper paid Bechtel $1 million for its assessment, yet the Bechtel Reports' conclusions and the critical underlying facts they discussed were hidden from ratepayers, investors and regulators until the Nuclear Project collapsed in mid-2017.  This is evident from a document titled the "Bechtel Report Action Plan," which was authored by Santee Cooper in February 2016, as later confirmed by Santee Cooper's General Counsel in a letter to South Carolina Governor McMaster on September 27, 2017.

56.     The Bechtel Report Action Plan, which was made available through a FOIA request, is a one-page memo written in the wake of the Second Bechtel Report.  The Bechtel Report Action Plan is divided into three sections: (i) "SCE&G Concerns;" (ii) "Santee Cooper Proposal for Use of Report;" and (iii) "Santee Cooper Action Steps."

57.     The Bechtel Report Action Plan reveals that Santee Cooper and SCANA were acutely aware of how public statements since October 2015 differed materially from Bechtel's undisclosed Assessment and Reports.  In the section of the Plan titled "SCE&G Concerns," Santee Cooper wrote: "***What mitigation effort is required to defend potential shareholder suit -- Now that SCE&G is specifically aware of problems in [the] report, failure to act may result in O&D [Officers' and Directors'] liability***."  The Bechtel Report Action Plan further described how SCANA and Santee Cooper colluded to ensure that any "disclosures" ***made to prospective buyers of each company's corporate debt*** – the primary source of funds used for the Nuclear Project – were "similar," given that they both knew the Nuclear Project was seriously troubled and they were concerned about how "***to defend [a] potential shareholder suit***."

58.    The Bechtel Report Action Plan also makes clear that Santee Cooper agreed to conceal the Bechtel Report from investors as long as SCANA would take certain steps in response to the Bechtel Report:

<u>SANTEE COOPER PROPOSAL FOR USE OF REPORT</u>

1.    We will continue to co-operate, within the law, **with SCE&G's efforts to avoid disclosure** on the condition that SCE&G will use the document as a template for project administration changes to be jointly decided, but must include:

The hiring of an EPC nuclear construction-experienced owners' engineer with authority to manage the project, Bechtel is not excluded from consideration;

An internal SCE&G project management change that will increase managerial staff and be led by a nuclear construction-experienced individual who is a direct report to Kevin Marsh whose sole responsibility is managing this construction project;

The Bechtel Report will be reviewed jointly by SCE&G and Santee Cooper leadership, section by section, together with Bechtel analysts, to determine specifically what administrative and operations changes will be made going forward with the project, effective immediately; and

Each change will include an objective metric to determine compliance and success.

59.    Later in 2016, Carter considered the potential disclosure of the Bechtel Report but again elected to keep this obviously material information under wraps.  In a November 28, 2016 email from Carter to Marsh, Carter asked to discuss the "[r]elease of the Bechtel Report to the Cooperatives," Santee Cooper's largest customers who purchase 70% of Santee Cooper's electricity, and who paid more than $422 million to Santee Cooper to finance the reactors since workers broke ground on the project. Carter noted that the Cooperatives had learned of the existence of a report by Bechtel and "demand[] a copy of the report." Carter noted that while SCANA had so far instructed

Santee Cooper not to release the Second Bechtel Report, "[n]ot releasing the information will likely bring formal requests that will be an untenable position for both companies."

60.    Santee Cooper set out specific steps that it believed SCANA should take in response to the Second Bechtel Report in exchange for Santee Cooper's agreement to hide the Bechtel Reports from investors, regulators and ratepayers. As set forth in the Bechtel Report Action Plan, Santee Cooper attempted to persuade SCANA to (i) hire an independent "nuclear construction-experienced owners' engineer with authority to manage the project;" (ii) hire an additional "nuclear construction-experienced individual" to be employed by SCANA "who is a direct report to Kevin Marsh [and] whose sole responsibility is managing this construction project;" (iii) review the Second Bechtel Report with Bechtel analysts "to determine specifically what administrative and operations changes will be made going forward with the project, effective immediately;" and (iv) create "objective metric[s] to determine compliance and success"

61.    One month after receipt of the Second Bechtel Report, on March 4, 2016, Santee Cooper sent Marsh a five-page memo titled "Santee Cooper Recommendations" setting forth some of these purported conditions. Santee Cooper wrote that "*[o]ver the past seven years, the Consortium's inability to coordinate itself and complete the engineering, procurement, and construction work necessary to deliver this project on a schedule has come at a high cost to the Owners*." Santee Cooper quantified its own cost as "approximately $35 million" for each month of delay. SCANA's costs were greater in light of its majority interest in the Nuclear Project. Santee Cooper stated, in no uncertain terms, that "***[n]ew project management and leadership are needed to overcome these challenges***," which have "***significant impact upon the Owners***."

24

62.    Santee Cooper impressed upon SCANA the need to act quickly: "[c]onsidering the Consortium's record, nearly three years of delays, and the risk associated with not receiving the production tax credits, it *is incumbent upon the Owners to employ increased and magnified oversight* to ensure that WEC and [subcontractor] Fluor will properly coordinate efforts to resolve the challenges facing the Project."

63.    In its March 4, 2016 memorandum, Santee Cooper further echoed the "objective metric," also set forth by Bechtel – *i.e.* the monthly progress percentage – that had to be met for the Nuclear Project to succeed and have a hope of being completed by the end of 2020:

> *In 2015*, only 3.7% direct craft progress *(0.31% per month)* was earned toward completion of the combined units. The year closed with overall direct craft construction at 18.7% complete. With 81% of the work to go, *the monthly construction progress must increase to around 2.5% if contract dates are to be achieved. Failure to realize a significant and sustained increase on this metric over the next six months will invariably result in more project delay*.

64.    Santee Cooper drafted another memo, dated March 3, 2016, produced through a FOIA request, which was sent to Santee Cooper's Board of Directors in preparation for a March 21, 2016 joint meeting of the two companies' Boards of Directors, titled "V.C. Summer – United 2 & 3 – Concerns with Consortium and EPC Management." The materials were shared with Santee Cooper's Board in advance of the joint Board meeting on March 21, 2016.  According to Santee Cooper, *"[t]he SCE&G oversight staff lacks the experience, and in some cases, the support of upper management, to hold the Consortium accountable for the work sold under the EPC [Contract]*."  This four-page memo, without specific attribution to Bechtel, echoes Bechtel's opinion that (i) "SCE&G needs to onboard professional EPC management support for the V.C. Summer

Project;" (ii) the changing members of the Consortium's inability to "fully complete[] and integrate[] the engineering, procurement and construction plans and schedules *necessary to deliver the Project*;" (iii) evidence that *Westinghouse "is not properly funding Fluor* to allow the addition of needed contractor employees;" (iv) a *lack of transparency* on the part of the Consortium; (v) the fact that Westinghouse's "*design engineering has been a significant impediment* to the Project from the outset;" and (vi) Westinghouse's *design "is often not constructible* requiring change modifications, impedes performance, and a source of numerous delays."

65.    Santee Cooper specifically highlighted the urgent need for oversight of the Nuclear Project's "planning, scheduling and execution."  Santee Cooper determined that "*schedule adherence [was] unrealistic*" because the "[p]lans and schedules contain unreasonable assumptions and do not reflect actual project circumstances."  Santee Cooper also stated that the "*project completion dates [were] artificially constrained*," "[c]ritical path material deliveries . . . *do not support construction need dates*," and "[m]issed milestones push-out and are rarely recovered."

66.    Shortly after receiving the Santee Cooper Recommendations, Marsh met with Santee Cooper to discuss their concerns in advance of the joint meeting of the two companies' Boards of Directors on March 21, 2016.  According to a March 14, 2016 email from Carter to Santee Cooper's Board of Directors, produced through a FOIA request, Carter and other Santee Cooper executives "met with Kevin Marsh and his team on Monday, March 7, [2016] to discuss" the Santee Cooper Recommendations, which were attached to the email as preparatory "materials for our Executive Section with the SCANA Board members on March 21, 2016."  Carter relayed details of their meeting to his Board

of Directors in the email, stating that "[w]e had a long and frank discussion regarding item 5 [concerning getting additional oversight] and the need for management changes to the Project."  According to Carter, Marsh agreed to "think about the issue and be ready to discuss on March 11, when he, Harold Stowe (SCANA's Lead Director), Leighton [Lord, Santee Cooper's Chairman of the Board] and I met."

67.    According to Carter's March 14, 2016 email, on March 11, 2016, Carter and Santee Cooper's Chairman of the Board met with Marsh and Stowe to discuss Santee Cooper's concerns and recommendations before the joint Board Meeting between the two companies.  During this high-level meeting, Santee Cooper "emphasized the need to address item 5 and **associated Project management changes**."  In particular, Carter "stressed the need for talent in the area of very large construction projects" who would "report to Kevin [Marsh] and I frequently."

68.    The November 2016 Santee Cooper Nuclear Timeline corroborates that on March 11, 2016 a CEO meeting took place in Columbia, S.C. where "Marsh, Harold Stowe, Carter, Leighton Lord – meet to discuss Santee Cooper's formal recommendations and expectations of SCANA for the planned Mar 21 Joint Board meeting."

69.    According to internal documents recently made available through a FOIA request, the Boards of Directors of SCANA and Santee Cooper held a joint Board Meeting on March 21, 2016 where they "**discussed Bechtel Report, Santee Cooper March 3 formal recommendations** ("March 3 Recommendations Memo") and SCANAs [sic] plan forward to address issues."  At this meeting, nearly six months after Bechtel completed its disastrous assessment, Marsh finally "committed that SCANA and Santee Cooper

would work to identify actionable Bechtel recommendations, SCANA would add EPC experts to its team, and that SCANA would charter a V.C. Summer Construction Oversight Review Board to help SCANA with project execution."

70.     After the joint Board meeting, on March 23, 2016, Carter sent Marsh a letter regarding the meeting.  Carter noted that the slide presentation at the March 21 joint Board meeting "was informative and fully consistent with information provided to us by Michael Crosby and our nuclear team."   Carter also stated that the "[t]he discussion between our Boards was *frank*," indicating that the Nuclear Project's troubles were "open[ly]" discussed at the March 21, 2016 joint Board meeting.

71.     Marsh's March 21, 2016 commitment to effect change in the management of the Nuclear Project was illusory.  According to the November 28, 2016 SC Nuclear Timeline, SCANA failed to even convene a Construction Oversight Review Board ("CORB") until July 2016, and this step was only taken after several months of inactivity and another joint meeting of the SCANA and Santee Cooper Boards, on June 20, 2016, where the issue of the CORB was raised once again.

72.     Indeed, in June 2016, despite SCANA's prior refusal, Santee Cooper continued to urge SCANA to retain an external, independent EPC management firm to help address the continuing problems with the Nuclear Project, finding SCANA's proposed CORB insufficient.  For example, as revealed in an email produced through a FOIA request, on June 2, 2016, Santee Cooper's Senior Vice President for Nuclear Energy, Crosby, emailed SCANA's Senior Vice President, Jeff Archie, copying Carter, among others, commenting, *inter alia*, on "SCANA's Project Assessment Report," which Santee Cooper had received at a "May 19 meeting with Kevin [Marsh,] Steve [Byrne] and

[Archie,]," among others.  In that June 2, 2016 email, Crosby wrote that "we have reviewed and appreciate the SCE&G commentary relative to *the engineering challenges that continue to impede progress on the [Project]* – namely design debt, *design constructability*, change paper, complex work packages, and emergent issue management."  Crosby stressed that there still was no significant improvement in the Nuclear Project's progress, to date: "Unfortunately, five months after WEC has had complete control of the Project, *there is little evidence that (WEC) is taking the steps necessary to resolve these challenges and relieve pressure on the substantial completion dates*.  Each meeting I attend we continue to report out and discuss *the same basic issues as progress on the critical path continues to slip*."  He further explained this was necessary for Santee Cooper and SCANA, "[a]s Owners, ... to ensure [] that we are doing all we can do to analyze project challenges . . . and hold WEC accountable for executing the project on the contract schedule."

73.    Similarly, on July 13, 2016, Carter wrote an email to Marsh.  In this email, Carter described how monthly construction progress had not improved at all since October 2015, continuing at the same dismal *0.5%* monthly progress rate observed by Bechtel, which was only *one sixth* of the necessary 3% monthly rate.  He explicitly recognized that this ongoing, massive shortfall in progress made it *impossible* for the Nuclear Project to meet the 2020 completion date that Defendants were still publicly touting at this time and thus to qualify for the $2.2 billion of Nuclear Tax Credits, contrary to their public representations.  Carter also laid out Santee Cooper's frustrations with both Westinghouse's continued poor performance and SCANA's role in allowing Westinghouse's poor performance to continue unchecked:

What has particularly frustrated Santee Cooper from the date of the 2015 Amendment [October 27, 2015] is WEC's failure to seize an opportunity and significantly ramp up construction progress at the site. . . . ***Through the last 6 months, while the Owners have paid $600 million dollars, construction progress has only been an aggregate of 3% [i.e., 0.5% per month]***. Moreover, for the June billing period, had the Owners accepted WEC's milestones and payment schedule, which contained twenty-seven milestones and requested payment of $156 million for the month, only four of the twenty-seven were completed, which would entitle WEC to payment of just $23.1 million. ***This rate of progress will never meet the current completion schedule, impacting production tax credits, the availability of cheaper energy for our customers, and bringing the costs of construction to conclusion***.

The DRB [Dispute Resolution Board] time crunch in which we find ourselves is unfortunate, but respectfully, was avoidable. ***The Santee Cooper team has been requesting since the first of this year that we immediately engage an independent analysis of the project's progress and needs going forward in order to better inform the Owner's position in the construction milestone debate***. Our first suggestion as to a particular vendor was not satisfactory to the SCE&G team. We continued to persist in our request through various delays we did not understand, the actual engagement with another vendor was not finalized until much later, and now we are in time constraints.

74.    The CORB was finally assembled in July 2016.  After "initial site visits" in July and August 2016, the CORB provided an "executive debrief" on August 16, 2016, and circulated a draft report on September 16, 2016, ***nearly a full year after the First Bechtel Report*** (the "First CORB Report").  It was clear from the face of the First CORB Report that the CORB's role was advisory only, and that it was a far cry from the dedicated EPC professional employee or firm recommended by Santee Cooper and Bechtel.  For example, the First CORB Report made clear that its purpose was "to offer insights and suggestions to enhance the execution of the V.C. Summer Unit 2 and Unit 3 Construction Project."  Further, while "responses will be reviewed by the CORB during future visits" scheduled quarterly, the CORB was explicit that "[o]bservations ***do not necessitate responses by project management***," *i.e.*, SCANA.

75.    While the First CORB Report lacked any enforcement power or accountability from management, the CORB came to many of the same conclusions as Bechtel and Santee Cooper nearly one year earlier.  Among other observations, the CORB highlighted the significant risks and impediments to completing the Nuclear Project on time.  For example, the CORB noted that "the Unit 2 & Unit 3 **project schedules include significant risks to achieve substantial completion**" and "**project schedule uncertainty is impacting the efficient assignment of oversight resources**."  The CORB also noted that the schedule being used by SCANA did not even include "all work to complete the project that should be in the schedule," meaning that additional time would have to be added to account for the work identified by the CORB including "subcontractor tasks," "engineering punch-lists," "test progress," and "licensing inspections, tests, analyses, and acceptance criteria."

76.    On November 28, 2016, after months of frustration and inactivity, Carter wrote Marsh an email in advance of a November 30, 2016 meeting of their "teams" to prepare for a December 5, 2016 third joint meeting of the two companies' Boards of Directors.  In this email, Carter attached the SC Nuclear Timeline and identified three "primary items" that Marsh, Carter, and their respective teams needed to discuss before the joint Board meeting.  One of these items was "[i]ncreased project management expertise in large scale EPC construction."  Carter noted that "[w]e need to be prepared to discuss with our board, after two years of requests and an affirmative commitment from you on more than one occasion," why there has not been an increase in "project management expertise" in response to the Bechtel Report.  Carter stated that SCANA's formation of the CORB, discussed above, was entirely unsatisfactory and ineffective, and

"I am concerned that we learn critical information too late from an outside team that comes in quarterly for a few days, [information] which should have been brought to our attention by our teams."

77.    In particular, at the end of the SC Nuclear Timeline attached to this November 28, 2016 email, Santee Cooper stated that "***SCANA's project management team . . . does not have the comprehensive skills and depth of experience necessary in engineering, scheduling, project controls and construction to manage a new build project laced with complexities***." Given these SCANA project management shortcomings, Santee Cooper again reiterated the need to add independent, qualified EPC managers to oversee the Nuclear Project:

> The Project would be greatly benefitted by infusing the current project management team with a framework of qualified EPC managers charged with working collaboratively with the Owner and Consortium to identify areas for improvement, suggest proven solutions, and to provide an independent perspective on actual progress – the effort aimed at increasing the accountability of the Consortium and the success of the Project.

78.    Meanwhile, the Nuclear Project continued to fall woefully behind schedule. An internal February 13, 2017 Santee Cooper memorandum sent by CEO Carter to the Santee Cooper Board, and produced through a FOIA request, revealed that the ***work productivity factor remained at an abysmal 0.7% per month at the end of 2016, and that only 30.9% of the project had been completed to date***. This document confirms that between October 2015 and February 2017, just over 10% of the Nuclear Project was completed.

79.    Carter further stated in the February 13, 2017 memorandum that SCANA's CORB had finally made recommendations in late 2016. At that time, the CORB concluded "that ***more Owner management was needed*** in three specific areas of the Project

(infrastructure, execution, and schedule quality)."  But no action had been taken in the intervening three months.  As Carter noted, the CORB's November 2016 conclusions and recommendations were no different than the recommendations made sixteen months earlier by Bechtel: *"[CORB's report] is consistent with Santee Cooper's position all along [and] the Bechtel report delivered in October of 2015*."

80.    Ultimately, Bechtel and Santee Cooper proved to be completely accurate in their predictions.  As Carter documented in an internal June 14, 2017 email to Santee Cooper executives and directors, SCANA and Santee Cooper determined that there would "*be an additional cost of over $4.5B and schedule delays in excess of 3 years*" to complete the Nuclear Project.

81.    As discussed above, on May 26, 2016, SCANA petitioned the PSC seeking approval to update the capital cost schedule and construction milestone schedule for the Nuclear Project.  SCANA informed the PSC that it had "notified Westinghouse that it will elect the Fixed Price Option" under the EPC Amendment, subject to Santee Cooper's concurrence and PSC approval.  The petition reflected an increase in total project costs of approximately $852 million over the cost approved by the PSC in September 2015, of which approximately $505 million was directly attributable to the fixed price option.  The project's estimated gross construction cost was estimated to be approximately $7.7 billion.

82.    On June 3, 2016, Santee Cooper's Board of Directors allowed SCANA to formally elect the fixed price option on both companies' behalf.  On July 1, 2016, SCANA executed the fixed price option, subject to PSC approval.  In a Directive, dated November 9, 2016, the PSC approved the revised schedule, costs and election of the fixed price

option, and found that "the evidence of record justifies a finding that the changes are not the result of imprudence on the part of" SCANA.

83.    The election of fixed price option created the expectation that Westinghouse would be willing and able to pay for any costs that exceeded the $7.7 billion fixed price. In reality, Santee Cooper knew at the time the fixed price option was selected that (i) costs would vastly exceed the $7.7 billion fixed price, and (ii) Westinghouse and its parent Toshiba would be unable to fund those excess costs.

84.    Westinghouse and Toshiba's financial condition – and the likelihood that the fixed price option could force one or both of them into bankruptcy – had been a constant topic of discussion and concern between SCANA and Santee Cooper since prior to SCANA's election of the fixed price option.  Carter sent Marsh a document titled "Nuclear Timeline – Project Bankruptcy Counsel" on November 28, 2016 (the "Santee Cooper Bankruptcy Timeline").  The Santee Cooper Bankruptcy Timeline detailed how, by March 2016, Santee Cooper and SCANA were not only aware of financial hardships facing Westinghouse and its parent, Toshiba, but were weighing the likelihood that Westinghouse would declare bankruptcy rather than pay the true costs of the Nuclear Project in excess of the fixed price.  These concerns were never disclosed to the public when SCANA elected the fixed price in May 2016.

85.    On June 7, 2016 – less than two weeks after SCANA filed a petition with the PSC announcing its intention to elect the fixed price option – Crosby, Santee Cooper's Senior Vice President for Nuclear Energy, sent Byrne a proposed agenda for a joint Board meeting on June 20, 2016.  In that agenda, listed under the discussion of the "Fixed Price Option" was "Potential Bankruptcy – outside legal opinion and plan to address."

86.    Marsh pushed back against discussing the potential bankruptcy with the companies' Boards in a June 16, 2016 email to Carter.  Carter responded to Marsh that same day, emphasizing that "the possibility of [a Westinghouse or Toshiba] bankruptcy cannot be entirely divorced from our joint board discussions on Monday."  He continued, "For example, Item No. 2 on your agenda relating to the fixed price option obviously shifts risk away from the Owners and to Toshiba/Westinghouse, making their credit worthiness all the more important. Similarly, with respect to Item No. 3, getting the milestone payment schedule right will make it less likely that Westinghouse view as desirable a strategic Chapter 11 bankruptcy to rid itself of uneconomical executive contract."

87.    The impact of a Toshiba or Westinghouse bankruptcy was ultimately discussed at the June 20, 2016 joint meeting of the SCANA and Santee Cooper Boards of Directors.  Carter wrote in an October 25, 2016 letter to Marsh that "[d]uring the June 20 joint meeting, members of both our Boards expressed concern about the financial difficulties being faced by Toshiba Corporation and Westinghouse Electric Company and how those problems could possibly impact the timely and successful completion of the project."

88.    Finally, on October 24, 2016, Carter, and Santee Cooper General Counsel, J. Michael Baxley, traveled to New York and interviewed potential bankruptcy counsel. The next day, on October 25, 2016, Carter wrote to Marsh requiring that the financial conditions of Toshiba and Westinghouse be presented to the Boards of both companies:

> [I]n a June 16, 2016 email to me, you expressed the very same concerns describing "the potential bankruptcy of Toshiba or Westinghouse [as] critical" but expressing the "prefer[ence] to have some detailed discussions and debate within our project teams before making a formal presentation to either of our Boards." ***The time for that formal presentation to the Board has arrived***.

89.     After no response from Marsh, on October 28, 2016, Santee Cooper sent an email to Marsh and SCANA's legal team informing SCANA that Santee Cooper had stepped in and retained a respected team of bankruptcy counsel for the nuclear construction project.

90.     In his November 28, 2016 letter to Marsh, Carter emphasized that "Bankruptcy expertise would significantly inform our team as we negotiate with WEC going forward.  Our separate, collective and independent analysis suggests that the fixed price option offered by WEC is likely significantly less than the cost WEC will incur to complete the Project.   This is the very reason that we selected the fixed price. *Regrettably, we must anticipate WEC having financial difficulty completing the Project, particularly in a timely manner*."  Carter further noted that Santee Cooper had been forced to retain bankruptcy counsel *"[a]fter no action [was taken by SCANA] on our repeated requests on this topic*."

91.     In that Santee Cooper March 3 Recommendations Memo, Santee Cooper calculated that each month of delay cost Santee Cooper – with a 45% ownership interest in the Nuclear Project – $35 million per month.

92.     Accordingly, and for the foregoing reasons, Defendants knew, beyond a shadow of a doubt, that the Nuclear Project would never be completed on time, if at all, and at the costs represented to the public.

### SANTEE COOPER MINI-BONDS

93.     Each May during the Class Period, Santee Cooper issued Mini-Bonds.  The Mini Bonds were "sold directly by the South Carolina Public Service Authority (the "Authority") only to residents of the State of South Carolina (the "State"), customers of the

36

Authority, members of electric cooperatives organized and existing under the laws of the

State, and electric customers of the Bamberg Board of Public Works, South Carolina and

the City of Georgetown, South Carolina."

94.     The Mini-Bonds were sold pursuant to "Official Statements."   During the

Class Period the following offerings of Mini-Bonds were made:

| Offering Document | Date | Amount Offered |
|---|---|---|
| 2016M1 Official Statement | May 1, 2016 | $42,142,700.00 |
| 2015M1 Official Statement | May 1, 2015 | $36,136,600.00 |
| 2014M1 Official Statement | May 1, 2014 | $39,584,800.00 |

95.     Each of the Official Statements listed identical risk factors regarding the

Nuclear Project:

> Nuclear Construction - Risk Factors. The construction of large generating plants such as Summer Nuclear Units 2 and 3 involves significant financial risk. Delays or cost overruns may be incurred as a result of risks such as (a) inconsistent quality of equipment, materials and labor, (b) work stoppages, (c) regulatory matters, (d) unforeseen engineering problems, (e) unanticipated increases in the cost of materials and labor, (f) performance by engineering, procurement, or construction contractors, and (g) increases in the cost of debt. Moreover, no nuclear plants have been constructed in the United States using advanced designs such as the Westinghouse AP1000 reactor. Therefore, estimating the cost of construction of any new nuclear plant is inherently uncertain.

> To mitigate risk, SCE&G, acting for itself and as agent for the Authority, provides project oversight for Summer Nuclear Units 2 and 3 through its New Nuclear Deployment ("NND") business unit. The Authority provides dedicated on-site personnel to monitor and assist NND with the daily oversight of the project. The managerial framework of the NND group is comprised of in-house nuclear industry veterans who lead various internal departments with expertise in: nuclear operations, engineering, construction, maintenance, quality assurance and nuclear regulations.

96.     But these "Risk Factors" were anything but "Risks" – Defendants *knew* at

the time the Official Statements were issued that the risks had already eventuated.

97.    The Official Statements were materially false and misleading because, as described herein, Santee Cooper knew that (1) SCE&G was not providing adequate oversight of the Nuclear Project; (2) Santee Cooper's own attempts to supervise the Nuclear Project were failing; and (3) that the Nuclear Project was already hopelessly behind schedule and unlikely to be completed, if at all, prior to the deadlines to earn financially necessary tax credits under the Energy Policy Act.

## CLASS ACTION ALLEGATIONS

98.    Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired Santee Cooper Mini-Bonds from August 23, 2013 and July 31, 2017, inclusive, and who were damaged thereby.  Excluded from the Class are: Defendants; members of the immediate family of any Defendant who is an individual; the officers and directors of Santee Cooper during the Class Period; any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; the Company's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person or entity.

99.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Santee Cooper regularly sold Mini-Bonds pursuant to the offering documents detailed above.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of

members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Santee Cooper or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

100.    The disposition of the claims in a class action will provide substantial benefits to the parties and the Court.

101.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- Whether the federal securities laws were violated by Defendants' acts as alleged herein;

- Whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of Santee Cooper;

- Whether the Individual Defendants caused Santee Cooper to issue false and misleading financial statements during the Class Period;

- Whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- Whether the interest rates of Santee Cooper Mini-Bonds during the Class Period were artificially deflated because of the Defendants' conduct complained of herein; and

- Whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

102.    Plaintiff's claims are typical of the claims of the other members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal law that is complained of herein.

103.    Plaintiff will adequately protect the interests of the Class and have retained competent counsel experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class. A class action is superior to other available method for the fair and efficient adjudication of this controversy.

<u>**COUNT ONE**</u>
**For Violation of Section 10(b) of the Exchange Act**
**And Rule 10b-5 (Against All Defendants)**

104.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

105.    Plaintiff asserts this Count pursuant to § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against Defendant South Carolina Public Service Authority.

106.    During the Class Period, Defendants disseminated or approved the false statements set forth above, which they knew or deliberately disregarded were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

107.    Defendants violated 10(b) of the Exchange Act and Rule 10b-5 in that they

(i)      Employed devices, schemes, and artifices to defraud;

(ii)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(iii)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in

connection with their purchases of Santee Cooper Mini-Bonds securities during the class period.

108.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior executive manager of Santee Cooper, Defendant Carter had knowledge of the details of Santee Cooper's internal affairs.  Defendant Carter is liable both directly and indirectly for the wrongs complained of herein.  Because of his position of control and authority, Defendant Carter was able to and did, directly or indirectly, control the content of the statements of Santee Cooper. As an officer of a publicly-held company, Defendant Carter had a duty to disseminate timely, accurate, and truthful information with respect to SCANA's businesses, operations, future financial condition, and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the interest rates of Santee Cooper Mini-Bonds were artificially depressed throughout the Class Period. In ignorance of the adverse facts concerning Santee Cooper's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired SCANA securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by Defendants, and were damaged thereby.

109.    Plaintiff and the other members of the Class have suffered damages in that, in reliance on the integrity of the market, they have received artificially deflated interest payments for Santee Cooper Mini-Bonds.  Plaintiff and the other members of the Class would not have purchased Santee Cooper Mini-Bonds at the promised interest rates, or

at all, if they had been aware that the interest rates had been artificially and falsely depressed by Defendants' misleading statements.

## COUNT TWO
### For Violations of Section 20(a) of the Exchange Act Against Defendant Carter

110.    Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

111.    By reason of his high-level position of control and authority as the Company's most senior officer, Defendant Carter had the power and authority to influence and control, and did influence and control, the decision-making and activities of the Company and its employees, and to cause Santee Cooper to engage in the wrongful conduct complained of herein.  Defendant Carter was able to and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Santee Cooper during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein. Defendant Carter was provided with or had unlimited access to copies of the Company's press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

112.    In his capacity as Santee Cooper's most senior corporate officer, and as more fully described above, Defendant Carter had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities law violations as alleged herein.

113.    Defendant Carter acted with severe recklessness and/or actual intent, as

set forth more fully above.

114.    By virtue of his position as a controlling person of Santee Cooper and as a result of his own aforementioned conduct, Defendant Carter is liable pursuant to Section 20(a) of the Exchange Act and to the same extent as the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.  Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.  Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.  Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.  Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury.

Dated: April 15, 2019                          **HOPKINS LAW FIRM, LLC**

                                               */s/ William E. Hopkins*
                                               William E. Hopkins (Federal Bar No. 6075)
                                               J. Clay Hopkins (Federal Bar No. 12147)
                                               12019 Ocean Highway
                                               Post Office Box 1885
                                               Pawleys Island, SC 29585
                                               Tel.: (843) 314-4202
                                               bill@hopkinsfirm.com

                                               **THE WEISER LAW FIRM, P.C.**
                                               Christopher L. Nelson
                                               James M. Ficaro
                                               22 Cassatt Avenue
                                               Berwyn, PA 19312
                                               Tel.: (610) 225-2677
                                               cln@weiserlawfirm.com
                                               jmf@weiserlawfirm.com