IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| MURRAY C. TURKA, on Behalf of Himself and All Others Similarly Situated, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No.  2:19-cv-1102-RMG |
| SOUTH CAROLINA PUBLIC SERVICE AUTHORITY and LONNIE N. CARTER, | ) ) ) | |
| Defendants. | ) ) ) | |

## SANTEE COOPER AND LONNIE CARTER'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

STATEMENT OF THE CASE .............................................................................................. 1

BACKGROUND ................................................................................................................... 4

    I.      Creation, Organization, Governance, and Ratemaking of the Authority ............... 4

    II.     Santee Cooper's 2014–2016 Series Mini-Bonds ...................................... 5

STANDARD OF REVIEW ................................................................................................... 9

ARGUMENT ........................................................................................................................ 10

    I.      Plaintiff's Claims Must be Dismissed Because He Fails to Adequately
          Plead Standing And That He Suffered an Economic Loss ................................... 11

          A.     Plaintiff Lacks Article III Standing Because He Has Not Suffered
                an Actual And Concrete Injury ............................................................. 11

          B.     Plaintiff Lacks Class Standing to Assert Claims in Connection
                With the Purchase of 2015 And 2016 Mini-Bonds .................................... 12

          C.     Plaintiff Fails to State a Claim Under Rule 10b–5 Because He Has
                Not And Cannot Allege Facts Establishing an Actual Pecuniary
                Loss ................................................................................................... 13

    II.     The Complaint Fails to Plead an Actionable Material Misrepresentation ............. 15

          A.     The Statements In the Risk Mitigation Paragraph Are Not
                Actionable As Material Misrepresentations ............................................ 17

                1.     The Statements Are All True Statements And Are Not
                      Misleading ....................................................................... 17

                2.     The Statements Are Not Material ................................................. 18

          B.     The Statements In the Risk Factor Paragraph Are Not Actionable
                 As Material Misrepresentations .............................................................. 19

    III.     The Complaint Fails to Adequately Plead Reliance ............................................. 21

          A.     Plaintiff Does Not Adequately Plead Direct Reliance .............................. 21

          B.     Plaintiff Does Not Adequately Plead Indirect Reliance ............................ 22

IV.     Plaintiff Fails to Adequately Plead Loss Causation.................................................24

V.      Plaintiff Fails to Raise a Strong Inference of Scienter...........................................28

        A.      Allegations of Concerns, Risks, and Dangers Do Not Allege
                Scienter ......................................................................................................30

        B.      Knowledge Does Not Equate To Or Infer Scienter ...................................31

        C.      The Innocent Inference Outweighs Any Opposing Malicious
                Interference ................................................................................................32

VI.     Plaintiff's Section 20(a) Claim Against Carter Must be Dismissed Because
        the Complaint Fails to State a Substantive Violation of the Securities Laws........34

CONCLUSION.....................................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AIG Global Securities Lending Corp. v. Banc of America Securities LLC*,
646 F. Supp. 2d 385 (S.D.N.Y. 2009) ...................................................................................14

*Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*,
568 U.S. 455 (2013) ...............................................................................................................10

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
827 F.3d 1229 (10th Cir. 2016) .............................................................................................30

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................................................................9

*Basic, Inc. v. Levinson*,
485 U.S. 224 (1988) ...............................................................................................18, 21, 22, 23

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................................9, 15

*Blue Chip Stamps v. Manor Drug Stores*,
421 U.S. 723 (1975) ............................................................................................................11, 12

*Blum v. Yaretsky*,
457 U.S. 991 (1982) ...............................................................................................................12

*Bondali v. Yum! Brands, Inc.*,
620 Fed. App'x 483 (6th Cir. 2015) (unpublished) ..........................................................19, 20

*Cook v. South Carolina Public Service Authority*,
No. 2017-CP-25-00348 (Hampton County, South Carolina Court of Common
Pleas filed Aug. 23, 2017) ........................................................................................................2

*Cozzarelli v. Inspire Pharmaceuticals Inc.*,
549 F.3d 618 (4th Cir. 2008) .................................................................................................34

*Dura Pharmaceuticals, Inc. v. Broudo*,
544 U.S. 336 (2005) ...............................................................................................13, 25, 26

*E.I. du Pont de Nemours & Co. v. Kolon Industries*,
637 F.3d 435 (4th Cir. 2011) .................................................................................................28

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011)..................................................................................21, 25

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*,
  528 U.S. 167 (2000)..........................................................................................11

*Gariety v. Grant Thornton*,
  368 F.3d 356 (4th Cir. 2004) ...............................................................22, 23, 24

*Gasner v. Board of Supervisors of the County of Dinwiddie, Virginia*,
  103 F.3d 351 (4th Cir. 1996) ............................................................................27

*Glibowski v. SCANA*,
  No. 9:18-cv-273-TLW (D.S.C. filed Jan. 31, 2018) ..........................................2

*Greenhouse v. MCG Capital Corp.*,
  392 F.3d 650 (4th Cir. 2004) .................................................................16, 18, 34

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014)...........................................................10, 21, 22, 23

*Hardin County Savings Bank v. City of Brainerd*,
  602 F. Supp. 2d 1012 (N.D. Iowa 2008)..........................................................26

*Hillson Partners Limited Partnership v. Adage, Inc.*,
  42 F.3d 204 (4th Cir. 1994) ...................................................................17, 18, 33

*Hodges v. Rainey*,
  533 S.E.2d 578 (S.C. 2000) ...............................................................................4

*Hutt v. City of Miami*,
  No. 10-cv-21451, 2011 WL 13220495 (S.D. Fla. Jan. 31, 2011)......................26

*In re Acterna Corp. Securities Litigation*,
  378 F. Supp. 2d 561 (D. Md. 2005)..................................................................13

*In re ChannelAdvisor Corp. Securities Litigation*,
  No. 5:15-CV-00307-F, 2016 WL 1381772 (E.D.N.C. Apr. 6, 2016), *aff'd sub nom. Dice v. ChannelAdvisor Corp.*, 671 F. App'x 111 (4th Cir. 2016)................20

*In re Citigroup Auction Rate Securities Litigation*,
  700 F. Supp. 2d 294 (S.D.N.Y. 2009)......................................................14, 23, 27

*In re Dynex Capital, Inc. Securities Litigation*,
  No. 05 Civ. 1897 (HB), 2009 WL 3380621 (S.D.N.Y. Oct. 19, 2009) ...................14

*In re First Union Corp. Securities Litigation*,
128 F. Supp. 2d 871 (W.D.N.C. 2001) ...................................................................32

*In re Jiffy Lube Securities Litigation*,
No. CIV. Y-89-1939, 1990 WL 10010982 (D. Md. Oct. 31, 1990) ........................23

*In re Pretium*,
256 F. Supp. 3d 459 (S.D.N.Y. 2017)....................................................................34

*In re Safety-Kleen Corp. Bondholders Litigation*,
No. 3:00-cv-1145, 2004 WL 3115870 (D.S.C. Nov. 1, 2004)...........................23, 24

*In re Sanofi Securities Litigation*,
155 F.Supp.3d 386 (S.D.N.Y. Jan. 6, 2016) ..........................................................19

*In re Taxable Municipal Bond Securities Litigation*,
51 F.3d 518 (5th Cir. 1995) ...................................................................................15

*In re Virtus Investment Partners, Inc. Securities Litigation*,
195 F. Supp. 3d 528 (S.D.N.Y. 2016)...............................................................18, 19

*Katyle v. Penn National Gaming, Inc.*,
637 F.3d 462 (4th Cir. 2011) ............................................................................10, 25

*Latigo Ventures v. Laventhol & Horwath*,
876 F.2d 1322 (7th Cir. 1989) ...............................................................................13

*Longman v. Food Lion*,
197 F.3d 675 (4th Cir. 1999) .................................................................................16

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)...............................................................................................11

*Maguire Financial LP v. PowerSecure International, Inc.*,
876 F.3d 541 (4th Cir. 2017) ...............................................................28, 29, 31, 32

*Matrix Capital Management Fund, L.P. v. BearingPoint, Inc.*,
576 F.3d 172 (4th Cir. 2009) .................................................................................29

*McCabe v. Ernst & Young, LLP*,
494 F.3d 418 (3rd Cir. 2007) .................................................................................26

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
693 F.3d 145 (2d Cir. 2012)...................................................................................12

*Ottmann v. Hanger Orthopedic Grp., Inc.*,
353 F.3d 338 (4th Cir. 2003) ............................................................................29, 33

*Philips v. Pitt County Memorial Hospital*,
    572 F.3d 176 (4th Cir. 2009) ...................................................................15

*Phillips v. LCI International, Inc.*,
    190 F.3d 609 (4th Cir. 1999) ..................................................................29

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
    632 F.3d 762 (1st Cir. 2011) ...................................................................12

*Retirement Board of Policemen's Annuity & Benefit Fund of Chicago v. FXCM Inc.*,
    333 F. Supp. 3d 338 (S.D.N.Y. 2018) .....................................................30

*South Carolina National Bank v. Stone*,
    139 F.R.D. 325 (D.S.C. 1991) .................................................................23

*South Carolina Public Service Authority v. Citizens & South National Bank*,
    386 S.E.2d 775 (S.C. 1989) ......................................................................4

*Shores v. Sklar*,
    647 F.2d 462 (5th Cir. 1981), *overruled on other grounds by Regents of Univ.
    of Cal. v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372 (5th Cir. 2007).....................24

*South Carolina v. United States*,
    912 F.3d 720 (4th Cir. 2019) ..................................................................14

*Teachers' Retirement System of Louisiana. v. Hunter*,
    477 F.3d 162 (4th Cir. 2007) ..............................................................9, 10, 14, 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...............................................................................29

*Tse v. Ventana Medical Systems, Inc.*,
    297 F.3d 210 (3d Cir. 2002)....................................................................15

*Winer Family Trust v. Queen*,
    503 F.3d 319 (3d Cir. 2007)...........................................................12, 13, 30

*Xia Bi v. McAuliffe*,
    927 F.3d 177 (4th Cir. 2019) ..................................................................21

*Yates v. Municipal Mortgage & Equity, LLC*,
    744 F.3d 874 (4th Cir. 2014) ....................................................10, 28, 29, 32, 33, 34

**Rules**
Federal Rules of Civil Procedure R. 9(b)................................................10, 14, 21, 24

Federal Rules of Civil Procedure R. 12(b)(1) ...............................................1

Federal Rules of Civil Procedure R 12(b)(6) ..........................................................................1, 13

Rule 10b–5, codified at 17 C.F.R. § 240.10b-5 .........3, 4, 10, 12, 13, 15, 16, 17, 20, 22, 28, 31, 34

Rule 15c2-12, codified at 17 C.F.R. § 240.15c2-12 ........................................................................6

**Statutes**

15 U.S.C. § 78j...........................................................................................................4, 10, 11, 29, 34

15 U.S.C. § 78t.......................................................................................................................... 4, 34

15 U.S.C. § 78u-4 ....................................................................................................................15, 24

15 U.S.C. § 78u-4(b)(1) ....................................................................................................................9

15 U.S.C. § 78u-4(b)(2) ..................................................................................................................28

26 U.S.C. § 103.................................................................................................................................4

26 U.S.C. § 115 (1) ..........................................................................................................................4

S.C. Code Ann. § 35-1-201(1) .........................................................................................................6

S.C. Code Ann. § 58-31-10...............................................................................................................4

S.C. Code Ann. § 58-31-30(A)(13) ..................................................................................................6

S.C. Code Ann. § 58-31-30(A)(14) ..................................................................................................6

S.C. Code Ann. § 58-31-30(A)(21) ...........................................................................................4, 5, 6

S.C. Code Ann. § 58-31-30(A)(23) ..................................................................................................5

S.C. Code Ann. § 58-31-80...............................................................................................................4

S.C. Code Ann. § 58-31-110.............................................................................................................4

S.C. Code Ann. § 58-31-140.............................................................................................................5

**Other Authorities**

Private Securities Litigation Reform Act of 1995 ...........................................9, 10, 16, 23, 28, 33

U.S. Const. Article III, § 2 .............................................................................................................11

U.S. Constitution Article III...................................................................................................11, 12

Pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure, Defendants South Carolina Public Service Authority ("Santee Cooper") and Lonnie N. Carter (collectively, the "Defendants") move to dismiss the claims asserted against them in Plaintiff Murray C. Turka's Complaint, with prejudice, because Plaintiff fails to adequately plead Article III standing and fails to state a claim against Defendants for which relief can be granted.

## STATEMENT OF THE CASE

Plaintiff asserts federal securities fraud claims against Santee Cooper and Carter, its former CEO, on behalf of a putative class of purchasers of Santee Cooper Mini-Bonds between May 1, 2014 and July 31, 2017.  Plaintiff alleges that the statements in the following two paragraphs in the official statements for the 2014, 2015, and 2016 Santee Cooper Mini-Bond offerings (each an "Official Statement" and collectively, the "Official Statements"), related to the construction of Units 2 and 3 in the V.C. Summer Nuclear Project (the "Project"), were false and misleading:

> Nuclear Construction - Risk Factors.  The construction of large generating plants such as Summer Nuclear Units 2 and 3 involves significant financial risk.  Delays or cost overruns may be incurred as a result of risks such as (a) inconsistent quality of equipment, materials and labor, (b) work stoppages, (c) regulatory matters, (d) unforeseen engineering problems, (e) unanticipated increases in the costs of materials and labor, (f) performance by engineering, procurement, or construction contractors, and (g) increases in the cost of debt.  Moreover, no nuclear plants have been constructed in the United States using advanced designs such as the Westinghouse AP 1000 reactor.  Therefore, estimating the cost of construction of any new nuclear plant is inherently uncertain.

> To mitigate risk, SCE&G, acting for itself and as agent for the Authority, provides project oversight for Summer Nuclear Units 2 and 3 through its New Nuclear Deployment ("NND") business unit. The Authority provides dedicated on-site personnel to monitor and assist NND with the daily oversight of the project.  The managerial framework of the NND group is comprised of in-house nuclear

> industry veterans who lead various internal departments with expertise in: nuclear operations, engineering, construction, maintenance, quality assurance and nuclear regulations.

(the "Risk Factors Paragraph" and the "Risk Mitigation Paragraph") (Compl. ¶ 95, ECF No. 1.) Plaintiff bases his claims on the theory that, to sell more Mini-Bonds, Santee Cooper concealed and failed to disclose that SCE&G and Santee Cooper were not providing "adequate" oversight and that the risks listed in those two paragraphs in the Official Statements "had already eventuated" because Defendants knew the Project's failure would sacrifice critical tax credits Santee Cooper would need to fulfill its debt obligations.

Plaintiff's case is nothing more than an ill-fated attempt to shoehorn a tort-based theory into a securities fraud class action—akin to trying to fit a square peg in a round hole—perhaps resulting from an attempt to identify claims that are not duplicative of those already asserted against Santee Cooper in the ongoing state and federal putative class actions.[1]  Plaintiff's claims represent a twist on an "artificially inflated price" theory, normally asserted in stock cases where the materialization of a concealed risk led to an immediate drop in the stock's price.  Unlike those cases, however, the Mini-Bonds Plaintiff purchased have been completely unaffected by the suspension of the Project and the materialization of the allegedly undisclosed risks. Significantly, Plaintiff has not alleged that (1) the Mini-Bonds are in default, (2) the value of the collateral securing the Mini-Bonds has been affected, (3) the Mini-Bonds have lost value on any secondary market, or (4) he will receive less than the full amount of interest or principal owed under the Mini-Bonds.  Indeed, Defendants have not located a single case supporting Plaintiff's

---

[1] *See Cook v. S.C. Pub. Serv. Auth.*, No. 2017-CP-25-00348 (Hampton County, South Carolina Court of Common Pleas filed Aug. 23, 2017); *Glibowski v. SCANA*, No. 9:18-cv-273-TLW (D.S.C. filed Jan. 31, 2018).

speculative theory that he suffered an actual, pecuniary injury because the interest rate of the Mini-Bonds he purchased may have been lower than the interest rate could have been on a hypothetical bond issued with complete disclosures. And for good reason—a plaintiff whose bonds have been completely unaffected by the materialization of an alleged undisclosed risk cannot adequately allege Article III standing, a pecuniary loss, or loss causation sufficient to plead a securities fraud claim under Rule 10b–5.

In addition, Plaintiff's scienter theory—that Defendants needed to conceal the true status of the Project in order to continue raising money in order to fund the Project's timely construction in order to obtain tax credits in order to fulfill its debt obligations, (*see id.* ¶ 10)—is convoluted, factually unsupported, and simply inapplicable. Plaintiff's allegations demonstrate that Santee Cooper worked in good faith toward completing the Project until circumstances mandated the Project's suspension. While Santee Cooper did pursue ways to monetize or transfer the benefits of the tax credits in light of Santee Cooper being exempt from taxation, that does not amount to securities fraud. That merely evidences Defendants' motive to act in the best interests of the company—a generalized motive shared by all companies and not actionable under the securities laws. Plaintiff's allegations amount to nothing more than a classic example of "fraud by hindsight," suggesting that the disclosures must have been fraudulent when made solely because the risks at issue later materialized. That cannot stand—particularly when the statements challenged by Plaintiff are immaterial and forward-looking in nature.

Accordingly, Plaintiff's securities fraud claims should be dismissed with prejudice for at least five reasons. *First*, Plaintiff lacks Article III standing and cannot plead the elements of a 10b–5 claim because he did not suffer an actual injury. *Second*, Plaintiff fails to plead an actionable material misrepresentation. *Third*, Plaintiff fails to adequately plead reliance because

he does not sufficiently allege either direct or indirect reliance.  *Fourth*, Plaintiff's allegation that the Mini-Bonds were overpriced is insufficient to plead loss causation.  *Fifth*, Plaintiff fails to raise a strong inference of scienter.  Additionally, Plaintiff's Section 20(a) claim against Carter fails because Plaintiff does not state a foundational Section 10(b) or Rule 10b–5 claim.

## BACKGROUND

### I.    Creation, Organization, Governance, and Ratemaking of the Authority

Santee Cooper was created in 1934 by an Act of the General Assembly.  Santee Cooper is a "body corporate and politic," which is "completely owned by and to be operated for the benefit of the people of the State."  S.C. Code Ann. §§ 58-31-10, 58-31-110.  Its revenue and properties (as well as interest earned by most of its bondholders) are exempt from state and federal taxation[2] and all of its "net earnings . . . not necessary for the prudent conduct and operation of its business" or to satisfy its bonds or other obligations must be "paid over semiannually to the State Treasurer for the general funds of the State and must be used to reduce the tax burdens on the people of this State."  S.C. Code Ann. § 58-31-110.  Since its creation, Santee Cooper has been recognized as an agency and instrumentality of the State of South Carolina.  *See, e.g.*, *Hodges v. Rainey*, 533 S.E.2d 578, 584 (S.C. 2000).

Santee Cooper "receives no State funds and operates entirely on the revenues from its operation."  *S.C. Pub. Serv. Auth. v. Citizens & S. Nat'l Bank*, 386 S.E.2d 775, 786 (S.C. 1989).  In creating Santee Cooper, the General Assembly made clear its intent that Santee Cooper would be self-sufficient and never use or obligate State resources.  Section 58-31-30(A)(21) provides that "any and all projects undertaken by the provisions of this chapter shall be financed as self-

---

[2] S.C. Code Ann. § 58-31-80; 26 U.S.C. §§ 115 (1), 103.

liquidating projects and that the credit and taxing powers of the State, or its political subdivisions, shall never be pledged to pay said debts and obligations." S.C. Code Ann. § 58-31-30(A)(21). The enabling legislation also provides that the "State and any of its political subdivisions shall never . . . make any appropriation [to Santee Cooper]." S.C. Code Ann. § 58-31-140.

In order to finance its operations and ensure Santee Cooper's fiscal independence, the General Assembly empowered Santee Cooper to finance projects by issuing bonds and other forms of indebtedness. S.C. Code Ann. § 58-31-30(A)(23). In order to secure the debt, Santee Cooper is authorized to issue revenue bonds, which "pledge all or any of the property, contracts, franchises, or revenues of the Public Service Authority thereunder." *Id.* The issuance of bonds and other debt instruments must be authorized by a resolution of Santee Cooper's Board of Directors containing the following provisions:

> (a) the rates of tolls and other charges for use of the facilities of, or for the services rendered by, or for the commodities furnished by the Public Service Authority, (b) the setting aside of reserves or sinking funds and the regulation and disposition of them . . . and (f) any other or additional agreements with the holders of the notes, bonds, or other evidences of indebtedness.

*Id.* Accordingly, Santee Cooper's Board of Directors passed a Master Revenue Obligation Resolution ("Master Resolution") on April 26, 1999, attached as Exhibit A. Santee Cooper issued the Mini-Bonds at issue here under the Master Resolution, as amended and supplemented.

## II.     Santee Cooper's 2014–2016 Series Mini-Bonds

Santee Cooper's Mini-Bonds are bonds available in smaller denominations than regularly issued bonds and sold directly from Santee Cooper to residents of South Carolina and Santee Cooper customers. (Compl. ¶ 93.) Santee Cooper Mini-Bonds are sold in two types: current

interest bearing bonds and capital appreciation bonds.  (*See, e.g.*, 2014 Official Statement at 2–3, attached as Exhibit B.)

Current interest bearing bonds, which Plaintiff purchased, are generally available in denominations of $500 or multiples thereof, for maturities of 5, 10, 15 and 20 years, pay interest each six months until maturity, and are tax-exempt.  (*Id.* at 2, 39–40.)  Plaintiff identifies three Mini-Bond offerings at issue in this case, each of which had one Official Statement:

| Offering Document | Date | Amount Offered |
|---|---|---|
| 2016M1 Official Statement | May 1, 2016 | $42,142,700.00 |
| 2015M1 Official Statement | May 1, 2015 | $36,136,600.00 |
| 2014M1 Official Statement | May 1, 2014 | $39,584,800.00 |

(Compl. ¶ 94.)  Each Official Statement disclosed that the bonds' purpose was to fund Santee Cooper's "ongoing capital improvement program."  (*See, e.g.*, Exhibit B at 2.)  The Official Statements included numerous disclosures that described Santee Cooper's various business operations, finances, and services in significant detail.  (*See, e.g.*, *id.*)  Although Santee Cooper issued the bonds for several capital improvements and not solely to support the Project, Plaintiff only takes issue in this action with the disclosures related to the Project.[3]

Each Official Statement contained the same Risk Factors Paragraph and Risk Mitigation Paragraph to which Plaintiff takes issue.  (Compl. ¶ 95.)  In addition, each Official Statement contained another section updating investors on the progress of Project construction and

---

[3] As set forth above, the Mini-Bonds were issued pursuant to Santee Cooper's Enabling Act, S.C. Code Ann. §§ 58-31-30(A)(13), (14) and (21) and Santee Cooper's Master Resolution.  The Mini-Bonds are revenue obligations of Santee Cooper and are exempt from South Carolina registration requirements in accordance with S.C. Code Ann. § 35-1-201(1).  Santee Cooper's Mini-Bonds were sold by Santee Cooper directly to investors in an intrastate offering without the use of an underwriter and so the Mini-Bonds were not subject to the continuing disclosure requirements of Rule 15c2-12 of the Securities Exchange Act of 1934.

described challenges and specific risk factors relating to the Project.  That section included

specific disclosure of problems that caused delays with the Project—a fact Plaintiff fails to

mention in his Complaint.

    In fact, the 2014 Official Statement included a four-page section containing, among other

things, the following specific disclosures concerning problems and related delays with the

Project:

- As a result of a July 11, 2012 settlement between SCE&G and the Consortium regarding certain delays, "the substantial completion dates for Summer Nuclear Units 2 and 3 changed from April 2016 and January 2019 (respectively) to March 2017 and May 2018."

- In June 2013, SCE&G announced, because of delays in the schedule for fabrication and delivery of sub-modules for the new units, "the substantial completion of Summer Nuclear Unit 2 is expected to be delayed from March 2017 to late 2017 or the first quarter of 2018 and the substantial completion for Summer Nuclear Unit 3 is expected to be similarly delayed."

- "Since August 2013, the Consortium has experienced additional delays in sub-module fabrication and deliveries. . . . SCE&G and the Authority are actively working with Consortium executive management to take actions necessary to minimize changes to the substantial completion dates announced in June 2013."

- "[T]he Authority is also aware of financial difficulties a supplier responsible for certain significant components of the project is experiencing.  The Consortium is monitoring the potential for disruptions in such equipment fabrication and possible responses.  Any disruptions could impact the project's schedule or costs, and such impacts could be material."

- "During the fourth quarter of 2013, the Consortium began a full re-baselining of the Unit 2 and Unit 3 construction schedules . . . The Authority anticipates that the revised schedule and the cost estimate at completion for all non-firm and fixed scopes of work will be finalized in the third quarter of 2014.  The Authority cannot predict with certainty the extent to which the issue of sub-module fabrication and deliveries will impact project costs or the anticipated re-baselined schedule."

(*See* Exhibit B at 28-31.)

    The 2015 Official Statement again included a section updating investors on Units 2 and 3

and devoted nearly two pages to describing Project challenges and risk factors.  (*See* 2015

Official Statement at 30–34, attached as Exhibit C.)  In addition to the same challenges and risks

described in the 2014 Official Statement, the 2015 Official Statement updated the disclosures

and noted that "[i]n early August 2014, SCE&G and the Authority received preliminary schedule

information in which the Consortium indicated the substantial completion of Unit 2 is expected

to occur in late 2018 or the first half of 2019 and that the substantial completion of Unit 3 may be

approximately 12 months later." (*Id.* at 33.)  The 2015 Official Statement also included the

following chart titled "Summary of Substantial Completion Dates":

*Summary of Substantial Completion Dates.*

|  | **Unit 2** | **Unit 3** |
|---|---|---|
| Original EPC - May 2008 | April 2016 | January 2019 |
| EPC - COL Delay - July 2012 | March 2017 (+11 months) | May 2018 (-8 months) |
| Proposed - Module Delay - June 2013 | December 2017 - March 2018 (+9 to +12 months) | March 2019 (+10 months) |
| Proposed - Rebaselined Schedule - August 2014* | December 2018 - June 2019 (+12 to +15 months) | June 2020 (+15 months) |

* Currently under review by the Owners.

(*Id.*)

The 2016 Official Statement again included a section updating investors on Units 2 and 3

and this time devoted nearly three pages to describing Project risks and challenges.  (*See* 2016

Official Statement at 30–35, attached as Exhibit D.)  In addition to the challenges and risks

described in the 2014 and 2015 Official Statements, the 2016 Official Statement provided a

detailed update regarding a significant amendment to the contract underlying the construction of

the Project and disclosed that the amendment "revises the guaranteed substantial completion

dates of Units 2 and 3 to August 31, 2019 and 2020, respectively." (*Id.* at 34.)  Accordingly,

Santee Cooper updated the chart titled "Summary of Substantial Completion Dates" to include

the new timeline provided to Santee Cooper by the Consortium.

8

# STANDARD OF REVIEW

To survive a motion to dismiss for failure to state a claim, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A "plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557). Plaintiffs must demonstrate more than "a sheer possibility that a defendant has acted unlawfully." *Id.* Indeed, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.*

To eliminate potential abuse in securities fraud actions, Congress provided for a heightened pleading standard in such actions when it enacted the Private Securities Litigation Reform Act of 1995 ("PSLRA"). "The PSLRA's requirements . . . are not technical pleading rules by which unwary plaintiffs can be trapped; they go to the heart of separating claims based simply on market risks from claims based on fraud." *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 189 (4th Cir. 2007). The Fourth Circuit has described the import of the PSLRA as follows:

> [I]n alleging misrepresentations or omissions under the PSLRA, a complaint must include "*each statement* alleged to have been misleading, *the reason* or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state *with particularity all facts* on which that belief is formed." 15 U.S.C. § 78u-4(b)(1) (emphasis added). And in alleging scienter, the plaintiff must, "with respect to each act or omission alleged to violate this chapter, state with particularity *facts giving rise to a strong inference* that the

9

> defendant acted with the required state of mind." *Id.* § 78u-4(b)(2) (emphasis added). The PSLRA also directs that any complaint not meeting the pleading requirements be dismissed.

*Id.* at 172.

 "The PSLRA sets forth specific standards for pleading the elements of misrepresentation and scienter, and thus supercedes Rule 9(b) to that extent." *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 n.5 (4th Cir. 2011). Although the PSLRA does not address the pleading standards applicable to the remaining elements of a Section 10(b) claim, "the pleading standard of Rule 9(b) still applies to those elements." *Id.*

## ARGUMENT

 "To recover damages for violations of section 10(b) and Rule 10b–5, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) ("*Halliburton II*") (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460–61 (2013)) (internal quotation marks omitted); *see also Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 884 (4th Cir. 2014). These requirements also must be satisfied to state a claim for control person liability under Section 20(a), which requires a predicate violation of the securities laws. *Teachers' Ret. Sys.*, 477 F.3d at 188. For the reasons explained below, Plaintiff fails to meet these and the heightened pleading requirements under the PSLRA. As a result, Plaintiff's Complaint should be dismissed with prejudice.

I.       **Plaintiff's Claims Must be Dismissed Because He Fails to Adequately Plead Standing And That He Suffered an Economic Loss.**

A.       **Plaintiff Lacks Article III Standing Because He Has Not Suffered an Actual And Concrete Injury.**

Article III of the U.S. Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies."  U.S. Const. Art. III, § 2.  In order to satisfy Article III's standing requirement, a plaintiff must show that "(1) it has suffered an 'injury in fact' that is (a) concreate and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  "The party invoking federal jurisdiction bears the burden of establishing these elements."  *Lujan*, 504 U.S. at 561.

To establish Article III standing to bring suit under the federal securities laws, a plaintiff must show that he suffered some non-speculative injury in fact.  *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 734–35 (1975).  A plaintiff who sues "for intangible economic injury such as loss of a noncontractual opportunity to buy or sell" has not suffered an actual injury and lacks standing to assert a claim under Section 10(b).  *Id.*

Here, Plaintiff has not suffered an "actual or imminent" injury.  Plaintiff has not alleged that the 2014 Mini-Bonds he purchased have lost any value.  Plaintiff has not alleged that (1) the Mini-Bonds are in default, (2) the value of the collateral securing the Mini-Bonds has been affected, (3) the Mini-Bonds have lost value on any secondary market, or (4) he will receive less than the full amount of interest or principal owed under the Mini-Bonds.  In short, the Mini-Bonds Plaintiff holds today have exactly the same value as they did when Plaintiff purchased

them, and he has not suffered any concrete, non-speculative loss.  As a result, Plaintiff lacks

Article III standing and his claims must be dismissed.

**B.    Plaintiff Lacks Class Standing to Assert Claims in Connection With the Purchase of 2015 And 2016 Mini-Bonds.**

Even if this Court were to find that Plaintiff had Article III standing—which it should

not—Plaintiff does not have class standing to assert Rule 10b–5 claims regarding alleged fraud

in connection with the 2015 and 2016 Mini-Bonds.  Standing to bring a private cause of action

under Rule 10b–5 is limited to those who actually purchased or sold the security at issue.  *See*

*Blue Chip Stamps*, 421 U.S. at 731.  A plaintiff cannot acquire standing merely by virtue of filing

a class action complaint on behalf of purchasers of other securities that he did not actually

purchase.  *See Winer Family Tr. v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007) (holding lead

plaintiff in Rule 10b–5 case "only has standing to pursue fraudulent conduct on or before its May

22, 2002 purchase date"); *see also Blum v. Yaretsky*, 457 U.S. 991, 999 (1982) ("Nor does a

plaintiff who has been subject to injurious conduct of one kind possess by virtue of that injury

the necessary stake in litigating conduct of another kind, although similar, to which he has not

been subject.").

Accordingly, a plaintiff only has standing to assert claims related to the bonds he actually

purchased.  *See Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance*

*Corp.*, 632 F.3d 762, 771 (1st Cir. 2011) (finding that lead plaintiffs, who purchased trust

certificates in two of eight trusts, lacked standing to represent purchasers and assert claims

related to other six trusts); *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693

F.3d 145, 164 (2d Cir. 2012) (holding that lead plaintiffs, who purchased certificates from two of

seventeen offerings, lacked standing to represent purchasers and assert claims related to ten of

the other trusts, which were not backed by same loans originated by common originators).

Moreover, only the allegedly fraudulent conduct occurring on or before the date a plaintiff

purchased his security is relevant to his decision to purchase the security; as a result, a plaintiff

cannot premise a securities fraud claim on allegedly fraudulent conduct occurring after he

purchased the security at issue.[4]  *See Winer Family Tr.*, 503 F.3d at 325–26.

     The only Mini-Bonds that Plaintiff purchased were in the 2014 offering.  (*See*

Certification of Murray C. Turka, ECF No. 1-1.)  Because he did not purchase the 2015 or 2016

Mini-Bonds, Plaintiff lacks standing to assert a claim under Rule 10b–5 related to those

securities.  Nor can he acquire standing to pursue such claims merely by purporting to represent

a class of buyers of those Mini-Bonds.  Accordingly, Plaintiff's claims based on the 2015 and

2016 Mini-Bonds should be dismissed.

### C.    Plaintiff Fails to State a Claim Under Rule 10b–5 Because He Has Not And Cannot Allege Facts Establishing an Actual Pecuniary Loss.

     Plaintiff's claims must be dismissed for the additional reason that he has not pleaded that

he has suffered an actual pecuniary loss, a requirement for liability under Rule 10b–5.  *Dura*

*Pharm., Inc. v. Broudo*, 544 U.S. 336, 343–44 (2005).  A plaintiff must "adequately allege

'proximate causation and *economic loss*' in order to survive a Rule 12(b)(6) motion."  *In re*

*Acterna Corp. Sec. Litig.*, 378 F. Supp. 2d 561, 570 (D. Md. 2005) (emphasis added) (citing

*Dura*, 544 U.S. at 346).  This is because "[i]nvestors cannot complain about a fraud that did not

cause them any harm."  *Latigo Ventures v. Laventhol & Horwath*, 876 F.2d 1322, 1325 (7th Cir.

---

[4] Three paragraphs in Plaintiff's 114-paragraph, 43-page complaint allege Defendants' awareness of Project problems prior to issuance of the 2014 Official Statement.  (Compl. ¶¶ 22–24.)  These are the only allegations relevant to Plaintiff's claim; he simply cannot, for instance, have relied on alleged misrepresentations that occurred after he purchased the 2014 Mini-Bonds.

1989).  Plaintiff must also plead the actual pecuniary loss caused by the defendant's conduct with sufficient specificity, a standard largely similar to that under Rule 9(b).  *See Teachers' Ret. Sys.*, 477 F.3d at 186.

Because Plaintiff cannot meet the less stringent Article III standing requirement, he cannot plead an actual pecuniary loss with sufficient specificity.  The bond offering cases in which courts have found an actual pecuniary loss involve default by the issuer, *see, e.g.*, *AIG Glob. Sec. Lending Corp. v. Banc of Am. Sec. LLC*, 646 F. Supp. 2d 385, 403 (S.D.N.Y. 2009) (finding loss where issuer became unable to pay interest guaranteed in the bond), loss of value on the secondary market, *see, e.g.*, *In re Dynex Capital, Inc. Sec. Litig.*, No. 05 Civ. 1897 (HB), 2009 WL 3380621, at *17 (S.D.N.Y. Oct. 19, 2009), or similar evidence of actual pecuniary loss. Plaintiff has not and cannot allege any such facts.

Moreover, Plaintiff's theory that he lost the opportunity to obtain more interest is wholly speculative.  It is entirely hypothetical to assume that Santee Cooper's disclosure of additional Project risks, above and beyond the risks already disclosed, would have resulted in Plaintiff having an opportunity to purchase the Mini-Bond at a higher interest rate.  And Plaintiff has pleaded no facts relating to how this higher interest rate opportunity would or could have come about.  Therefore, Plaintiff fails to state a claim.  *See In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294, 307 (S.D.N.Y. 2009) (finding no loss causation where plaintiff failed to plead any facts regarding how interest rates set through allegedly manipulative conduct were lower than they would have been absent such conduct); *see also South Carolina v. United States*, 912 F.3d 720, 727–28 (4th Cir. 2019) (finding no standing where plaintiff's theory of injury required assuming a series of speculative facts).

Indeed, nowhere in the Complaint does Plaintiff claim that additional disclosure would have changed the interest rate at which the bonds were sold, or how those rates were established. Plaintiff's assumption is just that—a purely hypothetical leap.  Allegations of a missed opportunity to obtain more interest—had hypothetical factual circumstances given rise to that opportunity—do not state a cognizable injury.  *See Tse v. Ventana Med. Sys., Inc.*, 297 F.3d 210, 220 (3d Cir. 2002) (holding in Rule 10b–5 case that "'lost opportunity' damages are not available where the fact of the loss, *i.e.*, whether there was any lost opportunity at all, is wholly speculative"); *see also In re Taxable Mun. Bond Sec. Litig.*, 51 F.3d 518, 523 (5th Cir. 1995) (holding that lost opportunity fails to state an injury under RICO).

Plaintiff did not allege facts establishing that he has suffered an actual pecuniary injury. He cannot do so because his claim that he hypothetically could have received more interest on his bonds is too speculative to ever establish a cognizable injury.  As a result, his securities fraud claims must be dismissed for failure to state a claim.

## II.     The Complaint Fails to Plead an Actionable Material Misrepresentation.

Plaintiff has not alleged a material misrepresentation that, if true, would be "'enough to raise a right to relief above the speculative level' and have 'enough facts to state a claim to relief that is plausible on its face.'"  *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (quoting *Twombly*, 550 U.S. at 555).  This too is fatal to Plaintiff's securities fraud claims.

The PSLRA's heightened pleading standard requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . all facts on which that belief is formed."  15 U.S.C. § 78u-4.  The Fourth Circuit in *Teachers' Retirement System* explained:

> [W]hile the Federal Rules generally allow a court . . . to take into account *any set of facts that could be proved* consistent with the allegations of the complaint, even though such facts have not been alleged in the complaint, the PSLRA modifies this scheme (1) by requiring a plaintiff *to plead facts* to state a claim and (2) by authorizing the court to assume that the plaintiff has indeed stated all of the facts upon which he bases his allegation of a misrepresentation or omission.

477 F.3d at 172 (emphasis in original). "The PSLRA's 'all facts' standard . . . changes the relevant set of facts for alleging misrepresentations and omissions to those alleged in the complaint." *Id.* at 173. In determining whether the complaint satisfies this heightened standard, the Fourth Circuit considers:

> the number and level of detail of the facts; the plausibility and coherence of the facts; whether sources of the facts are disclosed and the apparent reliability of those sources; and any other criteria that inform how well the facts support the plaintiff's allegation that defendant's statements or omissions were misleading.

*Id.* at 174.

In addition, Plaintiff must allege a *material* misrepresentation or omission under Rule 10b–5. *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 655–56 (4th Cir. 2004). "[A] fact stated or omitted is material if there is a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by the disclosure of the fact." *Longman v. Food Lion*, 197 F.3d 675, 683 (4th Cir. 1999). The Fourth Circuit has observed "that a 'reasonable investor' is neither an ostrich, hiding her head in the sand from relevant information, nor a child, unable to understand the facts and risks of investing." *Greenhouse*, 392 F.3d at 656. A reasonable investor is also "not necessarily a

'prudent' or 'conservative' investor." *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 216 (4th Cir. 1994).

Plaintiff alleges the statements in the Risk Factors Paragraph and the Risk Mitigation Paragraph were material misstatements. (Compl. ¶¶ 95–97.) Neither of these sets of statements are actionable.

### A.    The Statements In the Risk Mitigation Paragraph Are Not Actionable As Material Misrepresentations.

Plaintiff alleges that the statements in the Risk Mitigation Paragraph are material misstatements because:

> Santee Cooper knew that (1) SCE&G was not providing adequate oversight of the Nuclear Project; (2) Santee Cooper's own attempts to supervise the Nuclear Project were failing; and (3) that the Nuclear Project was already hopelessly behind schedule and unlikely to be completed, if at all, prior to the deadlines to earn financially necessary tax credits under the Energy Policy Act.

(*Id.* ¶ 97.) None of Plaintiff's theories transform the statements in the Risk Mitigation Paragraph into material misstatements under the federal securities laws.

### 1.    The Statements Are All True Statements And Are Not Misleading.

The statements Plaintiff alleges are misleading in the Risk Mitigation Paragraph are all true statements—SCE&G and Santee Cooper oversaw the Project. If the statements are not false or misleading, it is axiomatic that there is no basis for liability for a securities fraud claim under Rule 10b–5. *See Hillson Partners*, 42 F.3d at 208–09.

Plaintiff admits that SCE&G and Santee Cooper oversaw the Project, but argues the statements are misleading because SCE&G and Santee Cooper were not providing "adequate" oversight. However, on their face, the statements in the Risk Mitigation Paragraph do not amount to a promise or guarantee that SCE&G and/or Santee Cooper's oversight would prevent

the risks discussed in the Risk Factors Paragraph.  Santee Cooper did not insure against the risks

materializing.  In fact, Santee Cooper makes that clear when it begins the Risk Mitigation

Paragraph with the phrase "[t]o *mitigate* risk".  (*See, e.g.*, Exhibit B at 31 (emphasis added)); *see*

*In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 538 (S.D.N.Y. 2016) ("None of

the statements identified by Plaintiff are anything more than imprecise descriptors of Virtus

Partners' approach to oversight and do not amount to a promise or guarantee that its choices

would prevent the selection of managers or sub-advisers that were less than 'high quality.'").

The statements in the Risk Mitigation Paragraph are nothing more than general statements about

project oversight that made no promise or guarantee about the quality of the oversight or that the

oversight would prevent the risks listed from occurring.  Accordingly, the statements are not

actionable as material misrepresentations.

### 2.     The Statements Are Not Material.

Moreover, the statements in the Risk Mitigation Paragraph are not material.  In order to

hold otherwise, this Court would have to find that a reasonable investor would view the

statements in the Risk Mitigation Paragraph—that SCE&G and Santee Cooper provided

oversight of the Project—"'as having *significantly* altered the total mix of information made

available'" to a reasonable investor.  *See Greenhouse*, 392 F.3d at 656 (quoting *Basic, Inc. v.*

*Levinson*, 485 U.S. 224, 231–32 (1988)) (emphasis added).  The statements in the Risk

Mitigation Paragraph, however, are too vague and general to meaningfully impact a reasonable

investor's decision to purchase the bonds.  *See Hillson*, 42 F.3d at 212 ("A statement is only

material when there is a substantial likelihood that a reasonable investor would consider it

'significant'[.]"); *see also Basic*, 485 U.S. at 234 (the reasonable investor is not "child-like in

[his or her] simplicity . . . but [able] to filter out essentially useless information that a reasonable investor would not consider significant").

Courts have consistently held that statements regarding oversight or compliance are not material because they are too general to be actionable.  *See In re Virtus*, 195 F. Supp. 3d at 538 (concluding that statements claiming "disciplined" and "rigorous" oversight, despite defendants' alleged knowledge the oversight was not "in [any] way 'high quality . . . are too general to cause a reasonable investor to rely on them"); *In re Sanofi Sec. Litig.*, 155 F.Supp.3d 386, 401 (S.D.N.Y. Jan. 6, 2016) (concluding that company's statements concerning its legal compliance, such as "[w]e maintain an effective compliance organization," were not actionable because such statements were "too general to cause a reasonable investor to rely on them").

A reasonable investor would *expect* that a project such as this—the construction of a nuclear power plant using designs never used before in the construction of a nuclear plant in the United States (*see* Exhibit B at 31; Exhibit C at 31; Exhibit D at 35)—would be subject to oversight.  As a result, the statements regarding Project oversight would not "significantly alter[] the total mix of information available" to the reasonable investor and are therefore not material.

### B. The Statements In the Risk Factor Paragraph Are Not Actionable As Material Misrepresentations.

Plaintiff appears to allege the statements in the Risk Factors Paragraph were false or misleading because Defendants "knew at the time the Official Statements were issued that the risks had already eventuated."  (Compl. ¶ 96.)  Plaintiff's argument misses the mark.

"Risk disclosures . . . are inherently *prospective* in nature.  They warn an investor of what harms *may* come to their investment."  *Bondali v. Yum! Brands, Inc.*, 620 Fed. App'x 483, 491 (6th Cir. 2015) (emphasis in original) (unpublished).  Risk disclosures "'are not meant to educate

investors on what harms are currently affecting the company.'" *In re ChannelAdvisor Corp. Sec. Litig.*, No. 5:15-CV-00307-F, 2016 WL 1381772, at *5 (E.D.N.C. Apr. 6, 2016), *aff'd sub nom. Dice v. ChannelAdvisor Corp.*, 671 F. App'x 111 (4th Cir. 2016) (quoting *Bondali*, 620 Fed. App'x at 491). For these reasons, "'a reasonable investor would be unlikely to infer anything regarding the current state of a corporation's compliance, safety, or other operations from a statement intended to educate the investor on future harms'" and therefore, risk disclosures are not actionable misstatements under Rule 10b–5. *Id.* (quoting *Bondali*, 620 Fed. App'x at 491).

Similarly, the statements in the Risk Factors Paragraph are not actionable. Plaintiff's theory of liability—that at the time Santee Cooper issued the Official Statements the risks discussed in the risk disclosures had already occurred—is the same theory that has been uniformly rejected in this Circuit and others. *See id.* at *2, *5–6 (dismissing claim that risk disclosure was "misleading because it discloses, as a mere risk, circumstances ChannelAdvisor knew had already occurred" because "it is unlikely a reasonable investor would, from that cautionary language, infer anything about ChannelAdvisor's current contracts"); *Bondali*, 620 Fed. App'x at 487, 491 (affirming dismissal of claim that risk disclosures "were misleading because they portrayed . . . issues as a potential risk instead of a risk that had already materialized" because "as several courts have concluded, cautionary statements are not actionable to the extent plaintiffs contend defendants should have disclosed risk factors are affecting financial results rather than may affect financial results"). Accordingly, this Court should dismiss Plaintiff's securities fraud claims because the statements in the Risk Factors Paragraph are not material misstatements under Rule 10b–5.

### III.    The Complaint Fails to Adequately Plead Reliance.

The reliance element of a securities fraud claim "ensures that there is a proper 'connection between a defendant's misrepresentation and a plaintiff's injury.'" *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) ("*Halliburton I*") (quoting *Basic*, 485 U.S. at 243).  Failure to adequately plead facts establishing reliance at the motion to dismiss stage requires dismissal of the claims.  *See, e.g.*, *Xia Bi v. McAuliffe,* 927 F.3d 177, 184  (4th Cir. 2019)*.*  Allegations of reliance must meet the heightened pleading standards under Rule 9(b).  *Id.*  General and conclusory allegations of reliance will not suffice.  *Id.* at 185 (holding allegation that "[e]ach of the Plaintiffs relied on some or all of the statements in these newsletters, statements on [defendant's] websites and social media, and statements made by [company representatives] . . . during roadshows, in interviews, and in written materials" is a "general and conclusory allegation" insufficient to adequately plead reliance).  The reliance element can be satisfied either by proof of direct reliance or by one of the discrete reliance presumptions endorsed by the Supreme Court.  *See Halliburton II*, 573 U.S. at 268.

### A.    Plaintiff Does Not Adequately Plead Direct Reliance.

The only allegation that can be construed as alleging direct reliance is the allegation that Plaintiff relied upon "the price of the securities, the integrity of the market for securities, *and/or upon statements disseminated by Defendants*."  (Compl. ¶ 108 (emphasis added).)  That statement, however, is a conclusory allegation and is insufficient to meet the Rule 9(b) pleading standard for reliance.  *See Xia Bi*, 927 F.3d at 185.  Plaintiff does not allege any facts in support of his claim of direct reliance, including which "statements disseminated by Defendants" upon which he relied.  *See id.* at 184–85 (noting that "[h]ow and whether a party relied on a

misstatement is every bit as much a 'circumstance[ ] constituting fraud' as any other element").

Accordingly, Plaintiff fails to establish direct reliance.

### B.    Plaintiff Does Not Adequately Plead Indirect Reliance.

Plaintiff also alleges that he relied on the integrity of the market for the Mini-Bonds in purchasing his securities.  (*See* Compl. ¶¶ 108–109.)  However, "[a]pplication of the reliance presumption is not . . . automatic in all federal securities-fraud actions."  *Gariety v. Grant Thornton*, 368 F.3d 356, 364 (4th Cir. 2004).  Here, the fraud-on-the-market theory/*Basic* presumption is not applicable to Plaintiff's claims.

The "fraud-on-the-market" theory "holds that 'the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations.'"  *Halliburton II*, 573 U.S. at 268 (quoting *Basic*, 485 U.S. at 246).  In *Halliburton II*, the Supreme Court explained that "rather than scrutinize every piece of public information about a company for himself, the typical 'investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price'—the belief that it reflects all public, material information."  *Id.* (quoting *Basic*, 485 U.S. at 247).  "As a result, whenever the investor buys or sells stock at the market price, his 'reliance on any public material misrepresentations . . . may be presumed for purposes of a Rule 10b–5 action.'"  *Id.* (quoting *Basic*, 485 U.S. at 247.)

The Supreme Court has imposed a high standard for invoking the fraud-on-the-market theory:

> a plaintiff must make the following showings to demonstrate the presumption of reliance applies in a given case: (1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that

> the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed.

*Id.* The Supreme Court noted in *Halliburton II* that "*Basic* emphasized that the presumption of reliance was rebuttable rather than conclusive." *Id.*

At the motion to dismiss stage, a plaintiff must plead facts that plausibly support that he purchased the security at issue in an "efficient market." *See In re Jiffy Lube Sec. Litig.*, No. CIV. Y-89-1939, 1990 WL 10010982, at *9 (D. Md. Oct. 31, 1990) (holding at motion to dismiss stage "'to apply fraud-on-the-market theory . . . [i]t is necessary, therefore, that plaintiffs allege indicia of an efficient market") (internal citation omitted); *In re Citigroup*, 700 F. Supp. 2d at 306 (holding at motion to dismiss stage "where a plaintiff does not plead that the market in which he purchased his shares was efficient, he cannot rely on the 'fraud-on-the-market presumption' of reliance, and must instead specifically allege reliance"). Consequently, the Fourth Circuit has held that "to determine whether a security trades on an efficient market, a court should consider factors such as, among others, whether the security is actively traded, the volume of trades, and the extent to which it is followed by market professionals." *Gariety*, 368 F.3d at 368.

Plaintiff's attempt to invoke the fraud-on-the-market theory fails for a fundamental reason: Plaintiff purchased the bonds at issue in the primary market and the Supreme Court has *not* recognized a presumption for efficient (or inefficient) *primary* trading markets. *See In re Safety-Kleen Corp. Bondholders Litig.*, No. 3:00-cv-1145, 2004 WL 3115870, at *5 (D.S.C. Nov. 1, 2004) ("The purchasers who bought the bonds in the Initial Period were purchasers of

newly issued securities.  The court finds those purchases were not made in an efficient market.

Courts have repeatedly held that the market for new issues is not efficient.").[5]

Even if the fraud-on-the-market theory was available to purchasers in the primary market,

Plaintiff does not plead any allegations that would plausibly support that he purchased the Mini-

Bonds in an efficient market.  The Complaint is devoid of allegations concerning "whether the

security is actively traded, the volume of trades, and the extent to which it is followed by market

professionals."  *Gariety*, 368 F.3d at 368.  Instead, Plaintiff merely pleads he relied on the

"integrity of the market[,]" and alleges no facts to even indicate if there was a market to rely on

in the first place.  (*See* Compl. ¶¶ 108–109.)

Accordingly, Plaintiff's conclusory allegations regarding his reliance on the "integrity of

the market" are insufficient to invoke the fraud-on-the-market theory and therefore insufficient to

survive a motion to dismiss under the heightened pleading requirements of Rule 9(b).

## IV.    Plaintiff Fails to Adequately Plead Loss Causation.

In order to state a securities fraud claim, a plaintiff must plead loss causation, which

requires that "the act or omission of the defendant alleged to violate this chapter caused the loss

for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-4.  In order to establish loss

causation, the plaintiff must establish that the misrepresentation was at least "one substantial

---

[5] Prior to adoption of the PSLRA, a few courts presumed reliance on a "fraud created the market" theory for purchasers in the primary market.  *See S.C. Nat'l. Bank v. Stone*, 139 F.R.D. 325, 332 (D.S.C. 1991) (collecting cases).  The "fraud created the market" theory holds that absent fraud, the securities would not be marketable.  *See Shores v. Sklar*, 647 F.2d 462, 465–67, 469 (5th Cir. 1981), *overruled on other grounds by Regents of Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 392 (5th Cir. 2007).  The Fourth Circuit has never endorsed the theory and recent district court decisions in the Fourth Circuit have held the theory is not available.  *In re Safety-Kleen*, 2004 WL 3115870 at *7 ("the court rejects the fraud-created-the-market rule as inconsistent with Fourth Circuit caselaw").

cause" of his injury.  *Katyle*, 637 F.3d at 472.  Loss causation is derived from the common law

proximate cause requirement and must be pled with "sufficient specificity," which is largely

similar to the Rule 9(b) requirement of particularity.  *Id.* at 471–72.

The Supreme Court's 2005 opinion in *Dura Pharmaceuticals v. Broudo* significantly

changed the pleading requirements for loss causation in fraud-on-the-market cases.  *See* 544 U.S.

336 (2005).  Prior to *Dura*, some circuits allowed a plaintiff to establish loss causation merely by

alleging that the security price was artificially inflated as a result of the misrepresentation.  In

*Dura*, the Supreme Court held that this allegation, without more, was insufficient to establish

loss causation at the motion to dismiss stage.  *Id.* at 342.  The Court stated, "[f]or one thing, as a

matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss;

the inflated purchase payment is offset by ownership of a share that *at that instant* possesses

equivalent value."  *Id.* (emphasis in original).  Moreover, an inflated price may *contribute* to a

loss without being the *cause* of the loss; instead, the loss could be the result of other market

conditions, economic circumstances, changed investor expectations, industry-specific facts, or

other events.  *Id.* at 343.  "Other things being equal, the longer the time between purchase and

sale, the more likely that this is so, *i.e.,* the more likely that other factors caused the loss."  *Id.*

The Supreme Court noted that, to retroactively attribute that loss as resulting from an artificially

inflated stock price would effectively transform the securities laws into investor insurance rather

than merely preventing fraud.  *Id.* at 345.  Thus, *Dura* requires that a plaintiff show that a

misrepresentation that affected the integrity of the market price *also* has caused a subsequent

economic loss.  *Halliburton I*, 563 U.S. at 812.

Additionally, loss causation cannot be established through alleging reliance.  In other

words, a plaintiff does not establish loss causation by alleging that the fraud/misrepresentation

induced the plaintiff into buying the security, because that renders loss causation meaningless by collapsing it into reliance (or transaction causation). *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 429 (3rd Cir. 2007).

Plaintiff alleges that if the misleading statements had not been made, the Mini-Bonds he purchased would have been issued at a higher interest rate, and as a result, he would have made more profit. (Compl. ¶ 109.) Plaintiff's allegations are insufficient to establish loss causation for several reasons.

*First*, Plaintiff's allegation that the Mini-Bonds were overpriced (because the interest rate was too low) at the time of purchase, without more, is insufficient to establish loss causation under *Dura*. *See Dura*, 544 U.S. at 339–40, 346–47 (holding insufficient to establish loss causation the statement that "'[i]n reliance on the integrity of the market, the plaintiffs . . . paid artificially inflated prices for Dura securities' and the plaintiffs suffered 'damages' thereby" (emphasis and alterations omitted)); *Hardin Cty. Sav. Bank v. City of Brainerd*, 602 F. Supp. 2d 1012, 1022 (N.D. Iowa 2008) ("[T]he Complaint is replete with allegations stating or suggesting the Bonds were overpriced at the time of purchase due to Defendants' fraud. This is insufficient for purposes of establishing loss causation."). Plaintiff fails to allege how the alleged lack of oversight on the Project and materialization of the Project's risks set into motion a purported devaluation of his bonds. *Id.*; *cf. Hutt v. City of Miami*, No. 10-cv-21451, 2011 WL 13220495, at *5 (S.D. Fla. Jan. 31, 2011) (finding that plaintiff sufficiently alleged loss causation by alleging that bond was purchased at artificially inflated price and, when market learned of true conditions, trading price of bonds fell). Without showing that the alleged lack of Project oversight and materialization of the risks caused his Mini-Bonds to lose value, Plaintiff's

conclusory allegation that the bonds were overpriced at the time of purchase is insufficient as a matter of law to plead loss causation.

*Second*, Plaintiff's allegations cannot give rise to loss causation because he failed to allege how interest rates set through allegedly manipulative conduct were lower than they would have been absent such conduct. *See In re Citigroup*, 700 F. Supp. 2d at 307 (finding loss causation allegations insufficient where "Plaintiff does not specifically allege that he tried to sell his ARS, nor does he allege that the interest rates set through Defendants' allegedly manipulative conduct were lower than they would have been absent such conduct"). Plaintiff speculates that, had Santee Cooper fully disclosed the alleged true status of the Project, the Mini-Bonds he purchased could have been issued with a higher interest rate. There are no facts alleged to support Plaintiff's assumption that the rate would have been increased (because none exist). As a result, Plaintiff is unable to show that the allegedly improper disclosures proximately caused his alleged loss.

*Third*, even presuming for argument sake that a cognizable loss did occur, Plaintiff fails to allege facts demonstrating that any alleged loss was proximately caused by Santee Cooper's failure to disclose risks years ago—rather than the cancellation of the Project itself. *See Gasner v. Bd. of Supervisors of the Cty. of Dinwiddie, Va.*, 103 F.3d 351, 360 (4th Cir. 1996) (finding, in securities fraud case arising out of bond default, that representation in offering statement that technology was new and unproven did not cause loss where plaintiff failed to show that technology, and not other factors, caused project's failure). Indeed, Santee Cooper's general bond credit rating was downgraded following the Project's suspension—over a year after Santee Cooper suspended construction—but not as a result of any materialized misrepresentations in

bond offering statements.[6]  Nor does Plaintiff allege any causal connection to a misrepresentation.

Plaintiff's single allegation that he paid too much for his bonds at the time of purchase is insufficient to establish loss causation as a matter of law.  His failure to allege facts that could give rise to loss causation mandates dismissal of his claims.

## V.    Plaintiff Fails to Raise a Strong Inference of Scienter.

Even if Plaintiff had sufficiently plead a material misrepresentation—which he has not— the Complaint does not adequately plead scienter under the PSLRA's heightened pleading standards.  To establish scienter in a Rule 10b–5 case "a plaintiff must prove that the defendant acted with a mental state embracing intent to deceive, manipulate, or defraud." *Maguire Fin. LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 546–47 (4th Cir. 2017) (internal quotation omitted). The PSLRA "requires that the complaint in a private securities fraud action 'shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id.* at 546 (quoting 15 U.S.C. § 78u-4(b)(2)).

Although the PSLRA does not define what constitutes a "strong inference," "'[a] court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference.'" *Yates*, 744 F.3d at 885 (citation

---

[6] For example, the Moody's press release cited by Plaintiff, (*see* Compl. ¶ 9), discusses downgrading Santee Cooper's revenue bond rating, citing unstable governance, high leverage, litigation with Central, and uncertainty about future rate-setting—not improper disclosures.  *See E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 448 (4th Cir. 2011) ("In deciding whether a complaint will survive a motion to dismiss, a court evaluates the complaint in its entirety, as well as documents attached or incorporated into the complaint.").

omitted).  At the pleading stage, a plaintiff must allege either intentional or severely reckless

conduct.  *Id.* at 884.  "In the § 10(b) context, a reckless act is one that is 'so highly unreasonable

and such an extreme departure from the standard of ordinary care as to present a danger of

misleading the plaintiff to the extent that the danger was either known to the defendant or so

obvious that the defendant must have been aware of it.'"  *Id.* (quoting *Matrix Capital Mgmt.*

*Fund, L.P. v. BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009)).  "Such 'severe

recklessness' is, in essence, a slightly lesser species of intentional misconduct."  *Maguire*, 876

F.3d at 547 (quoting *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 344 (4th Cir.

2003)) (internal quotation marks omitted).  Thus, in order "[t]o survive a motion to dismiss in a

§ 10(b) complaint, 'the inference of scienter must be more than merely "reasonable" or

"permissible"—it must be cogent and compelling, thus strong in light of other

explanations.'"  *Id.* at 547 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308,

324 (2007).  In addition, "'[t]o the extent a plaintiff alleges corporate fraud, the plaintiff must

allege facts that support a strong inference of scienter with respect to at least one authorized

agent of the corporation.'"  *Yates*, 744 F.3d at 885 (citation omitted).

Here, the Complaint does not sufficiently plead the factual allegations necessary to give

rise to a strong inference of scienter for either Santee Cooper or Carter.[7]  Accordingly, the

Complaint must be dismissed.

---

[7] In addition, because the Complaint fails to plead the falsity of any of the challenged statements,
it "obviously fails to allege facts constituting [scienter]."  *Phillips v. LCI Int'l, Inc.*, 190 F.3d
609, 621 (4th Cir. 1999).

A.      **Allegations of Concerns, Risks, and Dangers Do Not Allege Scienter.**

The Complaint attempts to allege a strong inference of scienter by pointing to various

emails Defendants sent over the life of the Project expressing concerns and identifying risks and

dangers.[8]  For example, the Complaint alleges:

> [T]hroughout 2013 and 2014, Carter and Marsh secretly complained
> to each other, and to Westinghouse, that the Nuclear Project was "in
> danger because of submodule shipment delays and design failures. .
> . . CB&I's 'submodule delivery issues' . . . '[have] been a major
> source of concerns and risk for this project for a long time' and
> which 'plac[ed] the project schedule in jeopardy once again'. . . .
> 'the Consortium's inability to fulfill their contract commitments in
> a timely manner places the project's future in danger.

(Compl. ¶ 22; *see also id.* ¶¶ 23, 24, 75.)

Allegations regarding risks do not adequately plead with particularity facts giving rise to

a strong inference that Defendants intended to deceive, manipulate or defraud potential

purchasers of the Mini-Bonds.  *See, e.g.*, *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d

1229, 1250 (10th Cir. 2016) (noting that a defendant's disclosure of risks ordinarily weakens the

inference of scienter); *Ret. Bd. of Policemen's Annuity & Benefit Fund of Chicago v. FXCM Inc.*,

333 F. Supp. 3d 338, 352–53 (S.D.N.Y. 2018) (finding plaintiff failed to adequately plead

scienter where defendant "fully disclosed that it was exposed to risk" and thus "did not

knowingly mislead investors about the general risks inherent in" the business).  The emails in the

Complaint discussed the exact risks that Santee Cooper warned of in their Official Statements

and that Plaintiff appears to allege are somehow material misstatements.  (Compl. ¶¶ 31, 95.)

---

[8] Although Defendants' motion addresses the entire Complaint, Plaintiff's scienter allegations
should be limited to the three paragraphs alleging Defendants' awareness of Project problems
prior to issuance of the 2014 Official Statement (*see* Compl. ¶¶ 22–24).  *See Winer*, 503 F.3d at
326 (holding plaintiff "only has standing to pursue fraudulent conduct on or before its May 22,
2002 purchase date").

**B.    Knowledge Does Not Equate To Or Infer Scienter.**

The only allegations that Plaintiff can point to in an attempt to adequately plead scienter are allegations of Defendants' *knowledge* of potential schedule delays, cost overruns, and lack of appropriate oversight of the project. However, mere knowledge, standing alone, is not evidence of scienter. *Maguire*, 876 F.3d at 548.

The Complaint is devoid of any plausible allegations of Defendants' *intent to defraud* Mini-Bond purchasers. Plaintiff's theory of the case makes that very clear. After discussing the two paragraphs in the Official Statements that Plaintiff believes contain the material misrepresentations forming the basis of his case, Plaintiff alleges: "But these 'Risk Factors' were anything but 'Risks' – Defendants *knew* at the time the Official Statements were issued that the risks had already eventuated." (Compl. ¶ 96 (emphasis added).) Plaintiff then states "[t]he Official Statements were materially false and misleading because, as described herein, Santee Cooper *knew*" that SCE&G and Santee Cooper were not providing adequate oversight and the Project was behind schedule. (*Id*. ¶ 97 (emphasis added).) Nowhere in those three paragraphs does Plaintiff allege an intent to defraud. Knowledge is not enough.

In *Maguire*, the Fourth Circuit affirmed the district court's dismissal of Rule 10b–5 claims for failure to establish scienter, holding:

> [S]cienter and knowledge with respect to misrepresentation are distinct components of the requisite analytical framework. To conflate the two, as [plaintiffs] would have us do, would read the scienter element out of the analysis in contravention of the PSLRA's exacting pleading standard. . . . [Plaintiffs] allege[] facts that permit an inference that [the CEO] knew his statement was false, and then asks us to *infer from that inference* that [he] acted with scienter. We decline to do so because stacking inference upon inference in this manner violates the [PSLRA's] mandate that the strong inference of scienter be support by facts, not other inferences.

876 F.3d at 548 (emphasis in original) (internal citations omitted).  Here, Plaintiff makes the same mistake by conflating Defendants' alleged technical knowledge of the risk factors and lack of oversight of the Project, with the intent to willfully deceive Santee Cooper's investors as to the status of the Project.

In fact, the only allegation in the Complaint that actually addresses scienter admits that Plaintiff cannot adequately plead scienter:  "Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control."  (Compl. ¶ 108.)  That statement is insufficient to satisfy the PSLRA's heightened pleading standard.  *See In re First Union Corp. Sec. Litig*., 128 F. Supp. 2d 871, 886 n.14 (W.D.N.C. 2001) (stating that the rigorous requirements to plead scienter "apply even when the fraud relates to matters peculiarly within the knowledge of the opposing party") (internal quotation marks omitted).

Plaintiff's allegations regarding Defendants' knowledge as to the truth of the alleged material misrepresentations are insufficient as a matter of law to satisfy the scienter requirement.

### C.     The Innocent Inference Outweighs Any Opposing Malicious Interference.

Any malicious intent that could be inferred from Plaintiff's allegations is far outweighed by the innocent inference that Defendants disclosed all information they believed to be material at each point in time.  *See Yates*, 744 F.3d at 885 (noting that a court may "'only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference") (internal citations omitted).  The inferences to be drawn from the Complaint point to Defendants' innocent intent for at least three reasons.

*First*, Plaintiff's theory of fraud is nothing more than a critical view of the Project in hindsight.  Plaintiff asks the Court to believe that Defendants, despite knowing the Project would

never be completed, pushed on for years with the goal of recouping tax credits Santee Cooper was not certain it could use, diverting significant executive-level resources (including from Carter himself) from normal operations to try to right the ship, all for Santee Cooper to suspend construction of the Project abruptly in July 2017. Allegations and theories such as Plaintiff's in this case have been characterized by the Fourth Circuit as "fraud by hindsight" and are not actionable. *Hillson*, 42 F.3d at 209.

*Second*, Plaintiff's theory of why Defendants allegedly failed to disclose material information to investors is insufficient to infer fraud. The Fourth Circuit has "decline[d] . . . to infer fraud from financial motivations common to every company." *Yates*, 744 F.3d at 891 (refusing to infer fraud from allegations that "MuniMae wanted to artificially inflate the prices of its shares to attract investors, fund corporate acquisitions, avoid a default on loan covenants, and obtain favorable loan terms"); *see also Ottmann*, 353 F.3d at 352 (holding "these types of generalized motives—which are shared by all companies—[are] insufficient to plead scienter under the PSLRA"). Here, Plaintiff's allegation that Defendants needed to conceal the true status of the Project in order to continue raising money to fund the Project is exactly the type of generalized motive that the Fourth Circuit has warned is insufficient to plead scienter.

*Third*, the theory that Defendants attempted to conceal the delays in the Project schedule is inconsistent with Santee Cooper's repeated disclosure of delays in the Project schedule in the Official Statements. *See* supra at 6-8. Santee Cooper disclosed delays to the Project in each Official Statement at issue here and even included a chart for investors in the 2015 and 2016 Official Statements showing the evolution of the delays in the Project schedule. *Id.*

Had Defendants intended to lie to its investors about the problems and risks associated with the Project, it makes little sense that Santee Cooper would have disclosed problem after

problem and delay after delay. *See, e.g.*, *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 627 (4th Cir. 2008) (holding that plaintiffs' allegations failed to plead scienter where plaintiffs' theory of fraud was "improbable"); *In re Pretium*, 256 F. Supp. 3d 459, 478 (S.D.N.Y. 2017) (rejecting the "implausible" theory that defendant "invested tens of millions of dollars into drilling and associated studies in a venture that it secretly believed would not be profitable").

The overwhelming, and only logical, inference to be drawn from the allegations in the Complaint is that Defendants did not intentionally omit or misrepresent material facts related to the Project in order to deceive its bondholders. Thus, Plaintiff has failed to plead facts sufficient to establish the element of scienter, and Plaintiff's claim against Defendants must fail. Plaintiff's claim against Santee Cooper, specifically, also fails because Plaintiff has not adequately alleged scienter with respect to at least one authorized agent of Santee Cooper—a requirement to plead corporate fraud. *See Yates*, 744 F.3d at 885.

## VI.    Plaintiff's Section 20(a) Claim Against Carter Must be Dismissed Because the Complaint Fails to State a Substantive Violation of the Securities Laws.

In order to state a claim for personal liability under Section 20(a), Plaintiff must first allege a primary violation of the securities laws. *See, e.g.*, *Greenhouse*, 392 F.3d at 656 n.7 (noting that Section 20(a) is a "dependent derivative[] of [its] parent statutes, and [is] thus properly dismissed if the parent statutes fail to state a claim upon which relief may be granted"). Plaintiff's Section 20(a) claim against Carter must be dismissed because Plaintiff has failed to state a cause of action for violation of Section 10(b) or Rule 10b–5 for all of the reasons explained above, which are equally applicable to both Santee Cooper and Carter.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court dismiss the

Complaint with prejudice.

**[signature on next page]**

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: s/William C. Hubbard
    William C. Hubbard
    Federal Bar No. 1988
    E-Mail: william.hubbard@nelsonmullins.com
    Cory E. Manning
    Federal Bar No. 9697
    E-Mail: cory.manning@nelsonmullins.com
    A. Mattison Bogan
    Federal Bar No. 9826
    E-Mail: matt.bogan@nelsonmullins.com
    Carmen Harper Thomas
    Federal Bar No. 10170
    E-Mail: carmen.thomas@nelsonmullins.com
    1320 Main Street / 17th Floor
    Post Office Box 11070 (29211-1070)
    Columbia, SC  29201
    (803) 799-2000

    Robert L. Lindholm (*Pro Hac Vice* Application Pending)
    Federal Bar No. 52800
    E-Mail: robert.lindholm@nelsonmullins.com
    One Wells Fargo Center, 23rd Floor
    301 South College Street
    Charlotte, NC 28202
    (704) 417-3000

    J. Michael Baxley
    Senior Vice President and General Counsel
    South Carolina Public Service Authority
    Federal Bar No. 1248
    E-Mail: mike.baxley@santeecooper.com
    Post Office Box 294601
    Moncks Corner, SC  29461
    (843) 761-7044

    Attorneys for South Carolina Public Service Authority and
    Lonnie N. Carter

Columbia, South Carolina

July 12, 2019