IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Murray C. Turka, on behalf of himself and all others similarly situated, ) ) ) Plaintiffs, ) ) v. ) ) South Carolina Public Service Authority and Lonnie N. Carter, ) ) ) ) Defendants. ) ) | Civil Action No.: 2:19-1102-RMG<br><br>**ORDER AND OPINION** |

Before the Court is Defendants' motion to dismiss the complaint for failure to state a claim. (Dkt. No. 13.) For the reasons set forth below, the motion is denied.

I. **Background**

This is a securities fraud putative class action arising out of the abandoned construction of two 1,117-megawat AP1000 nuclear reactors at the Virgil C. Summer Nuclear Generating Station in Jenkinsville, South Carolina (the "Nuclear Project").[1] The Nuclear Project was a joint venture between state-owned utility, South Carolina Public Service Authority ("Santee Cooper"), owning 45%, and SCANA Corporation's ("SCANA") primary subsidiary, SCE&G, owning 55%. They agreed to the joint venture in 2008 and applied for a tax credit under the Energy Policy Act, which would provide an approximately $2.2 billion credit if the Nuclear Project were completed by January 1, 2021. (Dkt. No. 1 ¶¶ 3, 4.)

---

[1] The facts described are as alleged in the complaint and taken in a light most favorable to the non-movant.

To fund the Nuclear Project, Santee Cooper marketed and sold small denomination corporate bonds (the "Mini-Bonds") exclusively to its electricity customers and other South Carolina residents. Santee Cooper and SCANA began construction of the Nuclear Project in early 2013. On July 31, 2017, they publicly announced that they were abandoning construction due to cost. Approximately one year later, Moody's Investment Services downgraded Santee Cooper's credit rating. (*Id.* ¶¶ 1, 8, 9.)

Plaintiff Murray Turka brings this action on behalf of those that purchased or acquired the Mini-Bonds between May 1, 2014 and July 31, 2017. (*Id.* ¶ 98, Dkt. No. 21 at 6.) He brings two causes of action: violation of Section 10(b) of the Securities Exchange Act of 1934 and of Rule 10b-5 by Santee Cooper and Lonnie Carter, its President and Chief Executive Officer during the class period; and violation of Section 20(a) of the Securities Exchange Act by Carter. (Dkt. No. 1 ¶¶ 17, 104-114.) The basis of these claims is that Santee Cooper and Carter made or approved false or misleading statements to the Mini-Bond holders in Official Statements. (*Id.* ¶ 106.)

Specifically, the Mini-Bond holders purchased the security pursuant to the offering documents' Official Statements, which outlined generic "Risk Factors" typically associated with nuclear plant construction and development. (*Id.* ¶¶ 94-97.) The Official Statements, issued on May 1 of 2014, 2015 and 2016, provided:

> Nuclear Construction – Risk Factors. The construction of large generating plants such as Summer Nuclear Units 2 and 3 involves significant financial risk. Delays or cost overruns may be incurred as a result of risks such as (a) inconsistent quality of equipment, materials and labor, (b) work stoppages, (c) regulatory matters, (d) unforeseen engineering problems, (e) unanticipated increases in the cost of materials and labor, (f) performance by engineering, procurement, or construction contractors, and (g) increases in the cost of debt. Moreover, no nuclear plants have been constructed in the United States using advanced designs

2

such as the Westinghouse AP1000 reactor. Therefore, estimating the cost of construction of any new nuclear plant is inherently uncertain.

To mitigate risk, SCE&G, acting for itself and as agent for the Authority, provides project oversight for Summer Nuclear Units 2 and 3 through its New Nuclear Deployment ("NND") business unit. The Authority provides dedicated on-site personnel to monitor and assist NND with the daily oversight of the project. The managerial framework of the NND group is comprised of in-house nuclear industry veterans who lead various internal departments with expertise in: nuclear operations, engineering, construction, maintenance, quality assurance and nuclear regulations.

(*Id.* ¶ 95.) But, as Plaintiff alleges, at the time that Santee Cooper issued these Official Statements, it knew that the "significant financial risk" was no longer a hypothetical because the Nuclear Project was already behind construction schedule as a result of mismanagement. (*Id.* ¶¶ 95-96.)

To substantiate that allegation—that Santee Cooper and Carter knew that the Official Statements contained material misrepresentations—Plaintiff points to Santee Cooper's internal communications and its communications with SCANA, obtained pursuant to the Freedom of Information Act. These communications also serve as Plaintiff's examples of material information that Santee Cooper omitted from the Official Statements. For instance, in 2013—prior to when Plaintiff purchased his Mini-Bond in 2014—Carter communicated with Kevin Marsh, the President of SCE&G and later CEO of SCANA, that chronically delayed deliveries had already become a "major source of concern and risk for this project for a long time." (*Id.* ¶ 22.) Carter expressed that this inability to meet contractual commitments already, in 2013, "places the project's future in danger." (*Id.*) By September 2013, the repeated "unsuccessful attempts to resolve its manufacturing problem" already indicated "unrecoverable stress on the milestone schedule approved by the SC Public Service Commission." (*Id.* ¶ 23.) Similarly, in

3

2014, Carter and Marsh memorialized the contractors' pattern of "poor performance" in a letter to Nuclear Project designer Westinghouse Electric Company LLC, highlighting that the repeated delays had an "effect on the expected completion date and cost of the project." (*Id.* ¶ 24.)

These acknowledgements that the Nuclear Project was missing operations deadlines continued into the class period, after Plaintiff purchased his own Mini-Bond. For instance, in October 2015, the Bechtel Corporation—an engineering, construction and project management company that was commissioned to assess the Nuclear Project's progress—presented its finding to Santee Cooper and SCANA's executive committee that there were "significant issues" threatening the project's "successful completion." (*Id.* ¶ 43.) As a result, Betchel Corporation determined that Unit 2 of the Nuclear Project would not be in operation until "18-26 months beyond the current June 2019 commercial operation date" and Unit 3 would not be completed until "24-32 months beyond the current June 2020 commercial operation date." (*Id.* ¶ 45.) Later, in March 2016, Santee Cooper stated in a memorandum that in "2015, only 3.7% direct craft progress (0.31% per month) was earned toward completion of the combined units. . . . With 81% of the work to go, the monthly construction progress must increase to around 2.5% if contract dates are to be achieved. Failure to realize a significant and sustained increase on this metric over the next six months will invariably result in more project delay." (*Id.* ¶ 63.) Also in March 2016, a Santee Cooper memorandum estimated an "approximately $35 million" in costs per month of delay, noting that it has "significant impact upon the Owners." (*Id.* ¶ 61.)

On the basis of these and other communications, Plaintiff alleges that Santee Cooper and Carter were aware that the Official Statements mischaracterized the Nuclear Project's profile and, therefore, were aware that they were marketing and selling a security that carried a different

4

risk than what the Mini-Bond holders were lead to understand from the offering documents. As a result, Plaintiff alleges, the Mini-Bond holders were injured by receiving artificially deflated interest payments on the security. (*Id.* ¶ 108-109.)

## II. **Legal Standards**

### A. **Motion to Dismiss Under Rule 12(b)(6)**

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits the dismissal of an action if the complaint fails "to state a claim upon which relief can be granted." A Rule 12(b)(6) motion tests the legal sufficiency of the complaint and, therefore, the "inquiry then is limited to whether the allegations constitute a short and plain statement of the claim showing that the pleader is entitled to relief." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (internal quotation marks and citation omitted). The district court is obligated to "assume the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations." *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). Although the district court must accept the facts in a light most favorable to the plaintiff, it "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Id.* Therefore, to survive a Rule 12(b)(6) motion, the complaint must only provide enough facts to "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

### B. **Motion to Dismiss Under the Private Securities Litigation Reform Act**

The Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, "codified the pleading standard that a plaintiff must meet in a securities fraud action in order to

5

survive a 12(b)(6) motion to dismiss." *Iron Workers Local 16 Pension Fund v. Hilb Regal & Hobbs Co.*, 443 F. Supp. 2d 571, 587 (E.D. Va. 2006). It specifically codifies Rule 9(b) and, therefore, "[c]laims of securities fraud are subject to a heightened pleading standard under the PSLRA." *Zak v. Chelsea Therapeutics Int'l Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015).

Rule 9(b), which governs all actions alleging fraud, requires the plaintiff to "state with particularity the circumstances constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention to deceive, manipulate, or defraud." *Tellabs, Inc. v. Make Issues & Rights, Ltd.*, 551 U.S. 308, 213 (2007). The PSLRA further modifies the traditional Rule 12(b)(6) analysis "(1) by requiring a plaintiff to plead facts to state a claim and (2) by authorizing the court to assume that the plaintiff has indeed stated all of the facts upon which he bases his allegations of a misrepresentation or omission." *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 172 (4th Cir. 2007). Therefore, the "complaint must 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'" *PEC Solutions, Inc. Sec. Litig.*, 418 F.3d 379, 387 (4th Cir. 2005) (quoting 15 U.S.C. § 78u-4(b)(1)). "In order to meet this requirement, the complaint must contain the time, place, speaker, and contents of the allegedly false statement." *Iron Workers Local 16 Pension Fund*, 443 F. Supp. 2d at 578.

## III. Discussion

### A. Count One: Violation of Section 10(b) and Rule 10b-5 by Santee Cooper and Carter

In Count One, Plaintiff alleges that Santee Cooper and Carter violated Section 10(b) and SEC Rule 10b-5 (collectively, a plaintiff's "Section 10(b) claim")[2] by disseminating or approving false statements in the Official Statements during the class period. (Dkt. No. 1 ¶¶ 106-08.) Section 10(b) makes it unlawful "to use or employ, in connection with the purpose or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b); *see also* 17 C.F.R. § 240.10b-5.[3] To establish liability for a Section 10(b) claim, a plaintiff must sufficiently allege "(1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance [ ]; (5) economic loss; and (6) loss causation, *i.e.*, a causal connection between the material misrepresentation and the loss." *Hunter*, 477 F.3d at 172 n.2 (internal quotation marks omitted).

---

[2] SEC Rule 10b-5 is Section 10(b)'s implementing regulation; however, the scope of Rule 10b-5 is coextensive with the coverage of Section 10(b). It is therefore appropriate to refer to both the statute and rule together as the "Section 10(b) claim." *S.E.C. v. Pirate Investor LLC*, 580 F.3d 233, 237 n.1 (4th Cir. 2009).

[3] "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

Santee Cooper and Carter argue that Plaintiff lacks both individual and class standing, and that he failed to satisfy the PSLRA pleading standard as to all elements of a Section 10(b) claim, except "connection with purchase or sale of security."

1. **Standing**

    i. **Plaintiff has individual standing relating to the 2014 Mini-Bonds.**

Defendants first argue that Plaintiff lacks Article III standing to bring this securities action. "A potential class representative must demonstrate individual standing vis-à-vis the defendant; he cannot acquire such standing merely by virtue of bringing a class action." *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 423 (6th Cir. 1998). "The initial inquiry [ ] is whether the lead plaintiff individually has standing, not whether or not other class members have standing." *Winer Family Trust v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007).

Satisfying the Article III "case or controversy" requirement is the "irreducible constitutional minimum" of standing. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992). It implicates three elements: (1) the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Id.* at 560–61. In addition to the "immutable requirements of Article III, the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing." *Bennett v. Spear,* 520 U.S. 154, 162 (1997) (internal quotation marks omitted). Such

"judicially self-imposed limits on the exercise of federal jurisdiction" include the doctrine that "a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suite." *Id.*

Last, for a Section 10(b) claim, the operative statutory language for a standing inquiry is, "in connection with the purchase and sale." A plaintiff has standing to pursue a Section 10(b) claim "based on representations made after its purchase date." *Winer Family Trust*, 503 F.3d at 325; *see also Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975) (a Section 10(b) claim plaintiff must have purchased or sold, not merely continuously retained, the security). This "purchase-sale requirement must be interpreted so that the broad design of the Exchange Act, to prevent inequitable and unfair practices on securities exchanges and over-the-counter markets, is not frustrated by the use of novel or atypical transactions." *Kahan v. Rosenstiel*, 424 F.2d 161, 171 (3d Cir. 1970).

The crux of Defendants' argument is that the complaint's allegations does not fall within the "zone of interests" protected by Section 10(b) because Plaintiff has not suffered an injury in fact, in that he "has not alleged that the 2014 Mini-Bonds he purchased have lost any value." (Dkt. No. 13-1 at 19.) A Section 10(b) claim is properly brought by one who purchased the security after the alleged misrepresentations were made, and Plaintiff alleges that he purchased his Mini-Bonds pursuant to the May 1, 2014 Official Statement, alleged to contain misrepresentations and material omissions. *See, e.g., Arnlund v. Smith*, 210 F. Supp. 2d 755, 761 n.1 (E.D. Va., May 29, 2002) (named plaintiffs in putative class action have standing in Section 10(b) claim alleging nondisclosure of company's accrued expenses and liquidity situation, where plaintiffs purchased the security after alleged omission). Moreover, the complaint alleges that

Plaintiff "suffered damages in that, in reliance on the integrity of the market, they have received artificially deflated interest payments for Santee Cooper Mini-Bonds." (Dkt. No. 1 ¶ 109.) Deflated interest payments may constitute an actual injury, and receiving less earnings on an investment, even where the principle has not diminished in value, is a non-hypothetical injury particularized to that investment and security holder. These allegations support finding that Plaintiff has individual standing to assert these Section 10(a) and 20(b) claims as they relate to fraudulent conduct that occurred during or after his 2014 Mini-Bond purchase.

### ii. Plaintiff has class standing relating to the 2015 and 2016 Mini-Bonds.

Defendants next argue that Plaintiff lacks standing to bring the Section 10(b) and 20(a) claims on behalf of those who purchased the Mini-Bonds in 2015 and 2016, because Plaintiff "only has standing to assert claims related to the bonds he actually purchased" in 2014. (Dkt. No. 13-1 at 20.) A plaintiff may not bring a claim on behalf of others where he experienced "injurious conduct of one kind," but the putative class experienced "another kind" of injurious conduct. *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982). Similarly, where an issuer has multiple securities under the same shelf registration, for instance, a plaintiff who invested in some of those securities may, as the representative of a putative class, bring a claim based on securities he did not invest in so long as all of the claims implicate "the same set of concerns." *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162-64 (2d Cir. 2012). Where the securities' offering documents are alleged to have contained "nearly identical misrepresentations," then the individual and class claims raise "the same set of concerns." *Id.*

The injurious conduct that Plaintiff alleges he experienced was misstatements and material omissions in the 2014 Official Statement. The 2015 and 2016 Official Statements

employed verbatim language, thereby including the same material misstatements and omissions. The injurious conduct of 2014, therefore, raises the same set of concerns as does the conduct of 2015 and 2016. *See, e.g., New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 128 (2d Cir. 2013) (vacating and remanding district court's dismissal for lack of class standing to determine if, inter alia, the "relevant prospectuses contained similar, if not identical, descriptions of the underwriting standards"). The Court, therefore, finds that Plaintiff has class standing to assert the Section 10(b) and 20(a) claims on behalf of a putative class of 2015 and 2016 Mini-Bond purchasers.

**2.    Sufficiency of Pleadings to the PSLRA Standard**

Having determined that Plaintiff has individual and class standing, the Court now considers Defendants' arguments that he failed to plead the elements of a Section 10(b) claim to the PSLRA standard.

**i.    Misrepresentations and omissions of material fact**

To allege a false statement or omission of material fact under the PSLRA, "a plaintiff 'must point to a factual statement or omission—that is, one that is demonstrable as being true or false." *Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 342-43 (4th Cir. 2003) (internal quotation marks omitted). When pointing to a factual statement, the plaintiff must allege that the statement is false; and when pointing to an omission, the plaintiff must allege "that the omitted fact renders a public statement misleading." *Id.* at 343. In addition, to be actionable, "any statement or omission of fact must be material," *i.e.*, there must be "a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix

of information made available to be significantly altered by disclosure of the fact." *Ottman*, 353 F.2d at 343. Furthermore, in order to satisfy the heightened requirements for pleading misrepresentations or omissions to the PSLRA's standard, the plaintiff must identify "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if any allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 16 U.S.C. § 78u-4(b)(1). Because Section 10(b) claims are fraud claims, the plaintiff must also satisfy the Rule 9(b) pleading requirements and plead with particularity the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby. *In re Mut. Funds Inv. Litig.*, 566 F.3d 111, 120 (4th Cir. 2009), *rev'd on other grounds*, 564 U.S. 135 (2011). "[I]f the plaintiff fails to allege all facts but does allege sufficient facts to support a reasonable believe in the allegation that the defendants' statement was misleading, the court should deny the Rule 12(b)(6) motion as to this misrepresentation element." *Hunter*, 477 F.3d at 174.

Plaintiff has adequately alleged that the Official Statements contained misleading statements and omitted material facts. Plaintiff pled "each statement alleged to have been misleading, the reason or reasons why the statement is misleading,"—the 2014, 2015 and 2016 Official Statements that a nuclear build is subject to generic risk factors, and Santee Cooper's internal communications demonstrating that the Nuclear Project was already actually at risk. 15 U.S.C. § 78u-4(b)(1). Plaintiff also alleged the facts on which any beliefs were formed—Santee Cooper's internal communications and communications with its Nuclear Project partner acknowledging that the build was at risk as early as 2013. *Id.* Plaintiff also sufficiently pled with

particularity the time, place and contents of the false representations, as well as the identity of the person making the misrepresentation. Last, Plaintiff adequately alleged "what [Defendants] obtained thereby,"—investment in the Nuclear Project via Mini-Bonds that were marketed and sold under terms that did not reflect the Project's actual projected success. *Id.*

Defendants contend that any misstatements or omissions in the 2014, 2015 and 2016 Official Statements were not "material." The Official Statements provided, inter alia, that construction and engineering performance may contribute to financial risk on a nuclear build and, to that end, that daily project oversight would be provided on-site at this build. The Official Statements failed to mention that the Nuclear Project was, at that point, likely insurmountably behind its operation schedule. These omissions are material because they would have "altered the 'total mix'" of information made available to investors. *Matrix Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 43-44 (2011). Further, although the Fourth Circuit has explicitly refrained from taking a position on this issue, the majority rule indicates that the negative market reaction to the disclosures made by Santee Cooper, in which Moody's downgraded its credit rating and assigned the company a "negative" ratings outlook, further supports that these misstatements and omissions were material. *See Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 660-61 (4th Cir. 2004) (noting the majority position is that a fall of stock prices can be non-dispositive evidence of materiality); *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) ("[T]he materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock.").[4]

---

[4] Defendants also make a passing argument that the Official Statements were "forward-looking," succinctly contending that Plaintiff's scienter theory "cannot stand—particularly when the statements challenged by Plaintiff are immaterial and forward-looking in nature." (Dkt. No. 13-1

13

The Court finds that Plaintiff sufficiently alleged misstatements or material omissions as to Santee Cooper and Carter.

ii. **Scienter**

The PSLRA requires the complaint to "state with particularity facts giving rise to a [1] strong inference [2] that defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). First, and although "Congress left the key term 'strong inference' undefined," it must be "more than merely 'reasonable' or 'permissible'—it must be cogent [ ] and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc.*, 551 U.S. at 314, 324. "If the inference that a defendant acted innocently, or even negligently, [is] more compelling than the inference that they acted with the requisite scienter, then the complaint must be dismissed." *Pub. Emps. Ret. Ass'n of Colo. v. Deloitte & Touche LLP*, 551 F.3d 305, 313 (4th Cir. 2009). Second, the "required state of mind," is an "intent to deceive, manipulate, or defraud." *Ernest & Ernst v. Hochfelder*, 425 U.S. 185, 194 & n.12 (1976). For this state of mind, "negligence is not enough." *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 623 (4th Cir. 2008). Instead, "a plaintiff must show either intentional misconduct or such severe recklessness that the danger of misleading investors was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* (internal quotation marks omitted).

---

at 11.) A statement regarding future operations may be protected by the PSLRA's safe harbor provision if the statement is both identified as forward-looking and accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially." *Ollila v. Babcock & Wilson Enters., Inc.*, No. 3:17-cv-0109, 2018 WL 792069, at *4 (W.D.N.C. Feb. 8, 2018). The complaint alleges that the actual results of the Nuclear Project did differ significantly from what the generic Official Statements represented and, in any event, the statute's safe harbor "does not protect representations of current or historical fact," such as the status of the Nuclear Project's construction and management at the time each Official Statement was issued. *Id.*

14

Nevertheless, "it remains sufficient for plaintiffs [to] plead scienter by alleging facts establishing a motive and an opportunity to commit fraud, or by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999). The district court, therefore, "will assess the complaint as a whole" and consider "the number and level of detail of the facts, the plausibility and coherency of the facts, the sources of the facts and the reliability of those sources, and any other criteria that can be used to inform how well the facts support Plaintiffs' allegations." *Plymounth Cnty. Ret. Ass'n v. Primo Water Corp.*, 996 F. Supp. 2d 525, 539 (M.D.N.C. 2013). "[I]f the defendant is a corporation, the plaintiff must allege facts that support a strong inference of scienter with respect to at least one authorized agent of the corporation, since corporate liability derives from the actions of its agents." *Hunter*, 477 F.3d at 184. Because a "flexible, case-specific analysis is appropriate in examining scienter pleadings . . . courts should not restrict their scienter inquiry by focusing on specific categories of facts, such as those relating to motive and opportunity, but instead should examine all of the allegations in each case to determine whether they collectively establish a strong inference of scienter." *Ottman*, 353 F.3d at 345.

Plaintiff has sufficiently pled scienter as to Carter, alleged to have been Santee Cooper's President and Chief Executive Officer during the class period. (Dkt. No. 1 ¶ 17.) *See, e.g., KBC Asset Mgmt. NV v. 3D Sys. Corp.*, No. 0:15-cv-2393-MGL, 2016 WL 3981236, at *8 (D.S.C. July 25, 2016) (corporation's scienter sufficiently pled where allegation that individual defendant "held high positions within [the corporation] during the class period, and therefore had access to confidential information about the state of the Company as a result"). The complaint also provides substantial circumstantial evidence, from Santee Cooper and Carter's internal

15

communications and those with SCANA or Westinghouse, of Defendants' reckless or conscious decision to represent in the Official Statements that the Nuclear Project was subject to generic financial risk factors, but maintained under daily onsite oversight, notwithstanding that the risk of delay had already repeatedly materialized. Out of these allegations, the complaint generates a strong inference that Santee Cooper and Carter acted recklessly in that the danger of misleading Mini-Bond purchasers was so obvious that they must have been aware of it. Considering the totality of the circumstances alleged and giving "the inferential weight warranted by context and common sense," the Court finds that Plaintiff plausibly pled at least reckless scienter as to Santee Cooper and Carter. *Matrix Capital Mgmt. Fund, LP*, 576 F.3d at 183.

### iii. Reliance

To determine whether the plaintiff was justified in relying on a securities fraud defendant's misstatements or material omissions, the district court may consider eight factors, none of which is dispositive: (1) the sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal relationships; (3) access to relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations. *Banca Cremi, S.A. v. Alex Brown & Sons, Inc.*, 132 F.3d 1017, 1028 (4th Cir. 1997).

The complaint pleads that the Mini-Bond holders purchased the security pursuant to, and in reliance on, the Official Statements issued by Santee Cooper. The complaint also pleads that Santee Cooper exclusively marketed the Mini-Bonds to South Carolina residents and its own

electricity customers—individuals and entities that already had a relationship with their utility provider. These customers likely did not have access to information relevant to the Nuclear Project's construction and operation, at a minimum by virtue of the fact that Santee Cooper and SCANA were building and marketing the first nuclear power plant to be built in the United States since the 1980s. (Dkt. No. 1 ¶¶ 1, 3, 94, 95, 108.) These allegations suffice to satisfy the PSLRA pleading standard of reliance.

### iv. Economic loss

A securities fraud plaintiff "must allege and prove that the defendant's misrepresentations proximately caused the plaintiff's economic loss." *Hillson Partners Ltd. P'ship. v. Adage, Inc.*, 42 F.3d 204, 208 (4th Cir. 1994). Defendants dispute this element by way of their prior attack on Plaintiff's individual standing. As discussed, the complaint pleads that Plaintiff "suffered damages in that, in reliance on the integrity of the market, they have received artificially deflated interest payments for Santee Cooper Mini-Bonds." (Dkt. No. 1 ¶ 109.) Deflated interest payments may constitute an actual injury that is particularized to the investment vehicle and security holder. Plaintiff has, therefore, plausibly pled that he and the putative class suffered an economic loss as a result of the alleged misstatements and material omissions contained in the Official Statements.

### v. Loss causation

To establish loss causation, a plaintiff must plead "(1) the exposure of the defendant's misrepresentation or omission, *i.e.*, the revelation of 'new facts suggesting [that the defendant] perpetrated a fraud on the market; and (2) that such exposure resulted in the decline of [the defendant's] share price." *Singer v. Reali*, 883 F.2d 425, 445 (4th Cir. 2018) (internal quotation

marks omitted). Exposure to the misrepresentation or omission can be alleged under either a corrective disclosure theory or a materialization of concealed risk theory. *Id.* "On the one hand, under the corrective disclosure theory, a complaint may allege that the defendant company itself made a disclosure that publicly revealed for the first time that the company perpetrated a fraud on the market by way of a material misrepresentation or omission." *Id.* "On the other hand, utilizing the materialization of a concealed risk theory, a complaint may allege that news from another source revealed the company's fraud." *Id.* Under either theory, the ultimate question is "whether a misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Id.*

The complaint pleads that on July 31, 2017, Santee Cooper and SCANA announced that they were abandoning the Nuclear Project because construction costs had actually and untenably increased—arguably a public disclosure that corrected the previous Official Statements' statements that construction costs could be a risk to any nuclear build, but that the Nuclear Project would have onsite daily management to guard against such construction costs and delays. The complaint also pleads that upon this revelation, Moody's downgraded Santee Cooper's credit rating and assigned the company a "negative" ratings outlook. (Dkt. No. 1 ¶¶ 8, 9.) *See, e.g., In re SCANA Corp. Secs. Litig.*, No. 3:17-2616-MBS, 2019 WL 1427443, at *12 (D.S.C. Mar. 29, 2019). These are plausible allegations of a "causal connection between the material misrepresentation and the loss" suffered. *Dura Pharms, Inc. v. Broudo*, 544 U.S. 336, 342 (2005).

The Court finds that the complaint plausibly alleges the elements of a Section 10(b) claim to the PSLRA pleading standard. Defendants' motion to dismiss this claim is denied.

**B.     Count Two: Violation of Section 20(a) by Carter**

In Count Two, Plaintiff claims that Carter is liable for causing Santee Cooper to disseminate the false and misleading statements and omissions of material facts because he had control over the statements' content by virtue of his position as President and Chief Executive Officer during the class period. (Dkt. No. 1 ¶¶ 17, 110-114.) Section 20(a) imposes a derivative liability of Section 10(b): an individual is liable under Section 20(a), to the same extent the corporation is liable under Section 10(b), if he "directly or indirectly, controls any person liable" for violating Section 10(b), "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation[.]" 15 U.S.C. § 78t(a). Defendants move to dismiss the Section 20(a) claim solely because the complaint fails to establish a Section 10(b) claim; they make no argument that Carter acted in good faith. Because Plaintiff has established Santee Cooper's liability under Section 10(b), Carter's motion to dismiss the Section 20(a) claim is denied.

**IV.    Conclusion**

For the foregoing reasons, Defendants' motion to dismiss (Dkt. No. 13) is **DENIED**.

**AND IT IS SO ORDERED.**

_____
Richard Mark Gergel
United States District Judge

February 25, 2020
Charleston, South Carolina

19